J-S71035-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARLON GOODMAN | : | |
| | : | |
| Appellant | : | No. 3375 EDA 2017 |

Appeal from the Judgment of Sentence August 17, 2015
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003084-2013

BEFORE: PANELLA, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.: **FILED FEBRUARY 19, 2019**

Appellant Marlon Goodman appeals from the judgment of sentence imposed following his convictions for first-degree murder, persons not to possess firearms, carrying a firearm without a license, and possessing an instrument of crime (PIC).[1] Appellant claims that the police employed an unduly suggestive identification procedure and certain testimony violated his rights under the Confrontation Clause. We affirm.

The trial court summarized the relevant facts of this case as follows:

On October 1, 2012 around 3:50 p.m., the decedent, Donald Wesley ("Wesley"), the mother of his child, Janeeka Lindsey ("Lindsey"), and their young son were in Lindsey's car in front of Rita Precia's ("Precia") house at 1726 North Hollywood Street in the City and County of Philadelphia. Lindsey's grandmother lived on the block and Wesley was dropping Lindsey and the child off. Precia was sitting outside on her top step. Lateefah Shakur ("Shakur") was visiting her mother-in-law who lived across the

_____

[1] 18 Pa.C.S. §§ 2502(a), 6105(a)(1), 6106(a)(1), and 907(a), respectively.

street from Precia at 1721 North Hollywood. Shakur was walking down the steps of her mother-in-law's house to retrieve her baby when she saw Appellant, who was unfamiliar to her, running out of a grassy lot across the street yelling, "Bitch you thought it was over." Appellant came to a full stop in front of house 1728 in the middle of North Hollywood Street, looked at the car, and pulled a silver handgun from his side. Lindsey first noticed Appellant, who was unfamiliar to her, approximately fifteen (15) feet away in front of the car. Appellant shot once at Wesley, Wesley put the car in reverse and Appellant shot at him four or five (4-5) more times. Appellant began running away back toward the grassy lot on Glenwood Avenue when Wesley crashed the car into the front steps of 1720 North Hollywood Street. Lindsey heard Appellant say, "It ain't over, your brother is next." Lindsey got their child out of the back seat of the car and ran into her grandmother's house with the child. Wesley was also able to make it into the grandmother's house, but he promptly collapsed on the floor inside.

Precia, who witnessed the entire incident, called 911. Police Officer Edward Fidler ("Officer Fidler") arrived on the scene approximately two (2) minutes later. Wesley was still alive when Officer Fidler placed him in the back of his police car and transported him to Temple University Hospital. Wesley was pronounced dead on October 1, 2012 at 4:23 p.m. An autopsy was performed by Deputy Medical Examiner Dr. Ennis.[2] Upon reviewing the case file and photos of [the] autopsy, Deputy Chief Medical Examiner Dr. Albert Chu testified because Dr. Ennis was no longer with the Philadelphia Medical Examiner's Office. Dr. Chu determined the cause of death was a gunshot wound to the left arm and thorax. The manner of death was found to be homicide. Wesley was shot two (2) times. One (1) bullet went through the left arm, exited, and entered his chest where the bullet passed through Wesley's left and right lungs, aorta and esophagus. The other bullet entered the right arm. Two (2) bullets were recovered from Wesley's body. The injuries were consistent with Wesley sitting in [the] front seat and turning to look over his shoulder to reverse the direction of the car while a person standing in front of the car shot at him.

---

[2] Dr. Ennis's first name is not contained in the record.

That same day, Lindsey, Shakur, and Precia were transported to the Homicide Unit and gave nearly identical statements. Lindsey's interview with Detective Jeffrey Burke ("Detective Burke") started at 6:15 p.m. in a private office at the Homicide Unit. She recounted the shooting to Detective Burke and described Appellant as wearing dark cargo pants, a plaid shirt and a hat. While in the interview, Lindsey made two (2) five-minute phone calls. One (1) to her mother, JanLaRoyal Lindsey ("JanLaRoyal"), who was with Wesley's mother, Rita Wesley ("Rita W.") and the other to Wesley's brother, Brandon Wesley ("Brandon") who was with his cousins. None of these individuals saw the shooting, and Lindsey provided a description of the shooter on both calls. JanLaRoyal and Rita W. relayed that members of the community saw two (2) males parked in a car around the corner from the scene and observed the shooter get out of the car. Brandon explained that there was ongoing tension between individuals from North 33rd and Cumberland Streets where the Wesleys lived, and individuals from York Street after someone from Cumberland Street killed a person from York Street. Brandon further added that he was shot in June or July by someone named "Haas." Brandon suggested Haas shot Wesley and Marlon Williams was probably the driver. Lindsey then gave the aforementioned information she gleaned from both calls to Detective Burke and incorporated it into her statement. Detective Burke searched images of individuals named "Marlon" with ties to the 22nd District[fn5], printed six (6) individual photographs of these individuals, and showed them to Lindsey. There were no names associated with the photos Lindsey viewed, and there was no name on Appellant's photo. Lindsey identified Appellant as the shooter from the photographs at 6:46 p.m. Detective Burke did not assert that the person in the picture was the shooter upon displaying it to Lindsey.

[fn5] 33rd and Cumberland Streets, as well as York Street are included in the 22nd District.

Shakur saw Precia and Lindsey at the Homicide Unit, but they did not talk. Shakur's interview started at 6:20 p.m. and was conducted by Detective Spotwood. . . . In her statement, Shakur described Appellant as wearing dark green cargo pants and a plaid shirt. Detective Spotwood included Appellant's photo in the photo array shown to Shakur and she identified Appellant as the shooter at 7:06 p.m.

Precia also was about fifteen (15) feet away from Appellant when she first saw him. Her interview was conducted by Detectives Joyce . . . and Aitken . . . and started at 7:00 p.m. She described Appellant's clothing and hat. Precia circled Appellant's photo out of a photo array at 7:06 p.m.

Two pieces of ballistics evidence were recovered from the decedent's vehicle, a bullet and a bullet jacket. Five (5) fired cartridge casings were recovered from the scene. The ballistics evidence recovered from the vehicle and scene was compared with the ballistics evidence from Wesley's body and Police Officer Norman DeFields . . . of the Firearms Identification Unit determined that all ballistics evidence was fired from the same gun. The Commonwealth presented a certificate of non-licensure stating that . . . Appellant had no license to carry a firearm. The Commonwealth also presented evidence that . . . Appellant had a prior conviction on delinquency possession of a firearm by a minor.

Trial Ct. Op., 7/15/16, at 3-7 (record citations omitted).

Police arrested Appellant on October 4, 2012. On March 11, 2013, the Commonwealth filed a criminal information, charging Appellant with offenses related to the shooting. On July 29, 2015, Appellant filed a motion to suppress testimony regarding the witnesses' identifications of Appellant as the shooter. Appellant argued that the police presented the photographs to the witnesses in an unduly suggestive manner and the witnesses lacked independent bases for their identifications. Following a hearing, the court denied relief and the matter proceeded to trial.

On August 17, 2015, a jury convicted Appellant of first-degree murder, carrying a firearm without a license, and PIC. That same day, the trial court conducted a separate waiver trial and convicted Appellant of persons not to possess firearms. Immediately following the waiver trial, the court sentenced

Appellant to a mandatory term of life imprisonment without parole for the murder conviction with no further penalty for the remaining offenses.

Appellant timely filed a post-sentence motion, challenging the imposition of the mandatory sentence of life imprisonment. The post-sentence motion was denied by operation of law on December 22, 2015.

Appellant timely filed a notice of appeal on January 20, 2016. On December 6, 2016, this Court dismissed the appeal due to counsel's failure to file a brief. Appellant timely filed a counseled petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, on February 17, 2017.

On July 13, 2017, the PCRA court granted relief, reinstating Appellant's direct appeal rights *nunc pro tunc*. The court did not conduct a hearing on the matter, and the record indicates Appellant remained incarcerated on the date relief was granted. No further action occurred until October 3, 2017, when the PCRA court appointed current counsel to represent Appellant. On October 16, 2017, current counsel filed a notice of appeal *nunc pro tunc* on Appellant's behalf.[3]

_____

[3] "Generally, an appellate court cannot extend the time for filing an appeal." **Commonwealth v. Patterson**, 940 A.2d 493, 498 (Pa. Super. 2007). "Nonetheless, this general rule does not affect the power of the courts to grant relief in the case of fraud or breakdown in the processes of the court." **Id.** Here, the PCRA court reinstated Appellant's direct appeal rights *nunc pro tunc* on July 13, 2017, and Appellant had until August 12, 2017 to file his notice of appeal. Although the certified docket entries confirm the issuance of the order granting PCRA relief, the docket entries do not indicate that the court informed Appellant about the disposition of his petition. **See** Pa.R.Crim.P. 907 *cmt.* (stating, "When the disposition granting a petition reinstates a defendant's

Appellant timely filed a court-ordered Pa.R.A.P. 1925(b) statement on November 13, 2017. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion, concluding Appellant was not entitled to relief.

Appellant raises two issues for our review:

[1]. The trial court erred when it denied Appellant's motion to suppress because the identification procedures employed by the Philadelphia Police Department in this case were "unduly suggestive."

[2]. Appellant's Confrontation Clause rights were violated where the court allowed Dr. Albert Chu, whom did not perform the autopsy, to testify as to the cause of death and manner of death.

Appellant's Brief at 4.

In his first issue, Appellant contends that the Commonwealth failed to establish an independent basis for Lindsey's out-of-court identification. *Id.* at 13. By way of background, we reiterate that before the shooting, the decedent was driving Lindsey and their child. After the car stopped and Lindsey was about to exit, she saw an unfamiliar man with a firearm approach. The man yelled out, moved to within fifteen feet of the front of the car, and then opened fire. The decedent attempted to escape by putting the car into reverse, but

_____

direct appeal rights *nunc pro tunc*, the judge must advise the defendant by certified mail, return receipt requested that a new notice of appeal must be filed within 30 days of the order"). Moreover, the record does not indicate whether the court also removed prior counsel on July 13, 2017, as he subsequently took no further action on Appellant's behalf. Under these circumstances, we conclude a breakdown in the operations of the court excuses the apparent untimeliness of the instant appeal.

- 6 -

the car crashed into the front steps of a nearby residence. After the crash, Lindsey watched the shooter flee.

Approximately two-and-a-half hours after the shooting, Detective Burke interviewed Lindsey, and Lindsey described the shooter as "tall, dark-skinned and . . . wearing a cap." N.T., 8/10/15, at 18. During the interview, Lindsey made several phone calls during which she received information that "Marlon" was involved. *Id.* at 23. Based on this information, Detective Burke searched for photos of individuals named "Marlon" to show to Lindsey:

> [Detective Burke]: I wanted to see if [Lindsey] recognized Marlon once. If she identified him as, yeah, that's the guy from that area that they have been beefing with, I've seen him before, I could then try to ascertain who is Haas from him.
>
> [Prosecutor]: Were you going to, like, scoop him up?
>
> [Detective Burke]: No. I was going to see if he's ever been arrested with any males nicknamed Haas or if he's ever been stopped in a car, who the people are he's stopped with, then I could check if they ever used the nickname Haas or, you know, start from there, just a starting route.

*Id.* at 26. Detective Burke printed out six photos of potential suspects and showed them to Lindsey, who viewed Appellant's photo and identified him as the shooter. *Id.* at 119. Detective Burke did not make any statements to Lindsey indicating that the man in the photo might be the shooter. Detective Burke asked Lindsey some follow-up questions to confirm that she recognized the man in the photo as the shooter, and Lindsey reiterated her identification.

Appellant argues on appeal that the record contradicted Lindsey's testimony that she never took her eyes off the shooter. Appellant's Brief at

12. Appellant emphasizes that Lindsey provided a "basic" description of the shooter, but the other eyewitnesses included more specific details about the shooter's appearance, clothing, and firearm. *Id.* at 13. Appellant also claims Lindsey could not have faced the shooter as he approached, because she was in the process of exiting the car. *Id.* at 12. Appellant insists Detective Burke employed a suggestive identification procedure by showing Lindsey a single photograph of Appellant approximately three hours after the shooting. *Id.* Appellant suggests that the trial court should have granted his motion to suppress because the Commonwealth failed to establish an independent basis for Lindsey's out-of-court identification. *Id.* at 13.

We apply the following standard when reviewing the denial of a suppression motion:

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted).[4]

"In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." *Commonwealth v. Milburn*, 191 A.3d 891, 899 (Pa. Super. 2018) (citation omitted). "A photographic identification is unduly suggestive when the procedure creates a substantial likelihood of misidentification." *Commonwealth v. Crork*, 966 A.2d 585, 589 (Pa. Super. 2009) (citation and quotation marks omitted). "To establish reliability in the wake of a suggestive identification, the Commonwealth must prove, through clear and convincing evidence, the existence of an independent basis for the identification." *Commonwealth v. Davis*, 17 A.3d 390, 394 (Pa. Super. 2011).

> In deciding whether to admit contested identification evidence, the trial court must consider: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the

---

[4] We acknowledge the holding in *In re L.J.*, 79 A.3d 1073 (Pa. 2013), that after October 30, 2013, the scope of review for a suppression issue is limited to the record available to the suppression court. *Id.* at 1085, 1089 (stating holding applies to "all litigation commenced Commonwealth-wide after the filing of this decision"). Because the instant criminal information was filed on March 11, 2013, prior to October 30, 2013, *In re L.J.* does not apply. Nonetheless, although *L.J.* instructs the courts that for criminal cases commenced before October 30, 2013, it may be "appropriate to consider all of the testimony, not just the testimony presented at the suppression hearing, in determining whether evidence was properly admitted," *Commonwealth v. Chacko*, 459 A.2d 311, 317 n.5 (Pa. 1983), we limit our consideration to the suppression record.

perpetrator at the confrontation; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and confrontation. Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors.

***Milburn***, 191 A.3d at 899-900 (citations and quotation marks omitted).

Instantly, the trial court evaluated the totality of these circumstances as follows:

> [Detective Burke] testified that he used the information from [Lindsey's] phone calls . . . to search photos. Detective Burke specifically outlined his thought process, stating that . . . upon presenting the photos to Lindsey, Detective Burke was hoping that a potential identification of Marlon would lead police to the person suspected as the shooter at that time, Haas. Six (6) individual photographs of individuals named "Marlon" with ties to the 22nd District were printed without identifying information and provided to Lindsey. Lindsey identified Appellant as the shooter from the photographs.
>
> Though Lindsey received information from [her mother and the decedent's mother and brother], Lindsey still had to rely on her own, close-range observation of the Appellant to make a positive identification . . .
>
> \* \* \*
>
> At no time did Lindsey waver in her identification, and the time between the crime and Lindsey's confrontation was a mere four (4) hours. Lindsey provided the description of Appellant in the phone conversations; [Lindsey's mother and the decedent's mother and brother] merely provided the context from members of the community and [the decedent's brother's] personal knowledge.

Trial Ct. Op. at 10-11.

Therefore, the trial court noted that the factors supporting the reliability of Lindsey's identification included her opportunity to view the perpetrator,

the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. ***See Milburn***, 191 A.3d at 899. We agree with the trial court that Lindsey's out-of-court identification of Appellant was sufficiently reliable and supported by the record. ***See Smith***, 164 A.3d at 1257. Accordingly, we conclude that the trial court properly denied Appellant's motion to suppress.

In his second issue, Appellant contends that the Commonwealth violated his right to confront witnesses when it called Dr. Chu to testify about the autopsy report authored by Dr. Ennis. Appellant's Brief at 15. Appellant acknowledges Dr. Chu's testimony that he did not know Dr. Ennis's whereabouts at the time of trial, but argues that such testimony failed to satisfy the Commonwealth's burden to show that Dr. Ennis was "unavailable" under the Confrontation Clause. ***Id.*** at 15-16. Appellant further claims that Dr. Chu did not base his conclusions on an independent review of Dr. Ennis's report. ***Id.*** at 16. Appellant concludes he is entitled to a new trial on this basis. ***Id.*** at 17.

To preserve a claim of error in conjunction with a court's evidentiary ruling, a party must make a timely and specific objection in the trial court. ***See*** Pa.R.E. 103(a)(1)(A), (B). "The law is clear that issues, even those of constitutional dimension, are waived if not raised in the trial court. A new and different theory of relief may not be successfully advanced for the first time on appeal." ***Commonwealth v. Cline***, 177 A.3d 922, 927 (Pa. Super. 2017),

*appeal denied*, 187 A.3d 922 (Pa. 2018) (citation and quotation marks omitted).

Here, Appellant failed to raise any objection to Dr. Chu's testimony in the trial court. Further, Appellant failed to include this claim in his post-sentence motion. **See** Pa.R.Crim.P. 720(B)(1)(a) (reiterating that all requests for relief from the trial court should be stated with particularity in the post-sentence motion). Therefore, Appellant's claim is waived. **See** Pa.R.A.P. 302(a) (stating that issues that are not raised in the trial court are waived and cannot be raised for the first time on appeal); Pa.R.E. 103(a).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/19