J-S39035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JOSEPH HOLMES | : | |
| Appellant | : | No. 3734 EDA 2016 |

Appeal from the Judgment of Sentence April 19, 2013
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002747-2009

BEFORE: LAZARUS, J., OLSON, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED SEPTEMBER 23, 2020**

Joseph Holmes (Holmes) appeals *nunc pro tunc* from the April 19, 2013 judgment of sentence imposed by the Court of Common Pleas of Philadelphia County (trial court) following his convictions for aggravated assault, robbery, kidnapping, persons not to possess, conspiracy, and possession of an instrument of crime.[1] After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2702(a), 3701(a)(1)(ii), 2901(a)(1), 6105(a)(1), 903(a)(1), & 907(a). Holmes was convicted following a bifurcated trial at which the trial court sat as fact-finder for the charge of persons not to possess and the remaining charges were adjudicated by a jury.

**I.**

**A.**

The trial court summarized the facts of this case as follows:

On October 24, 2008, [Holmes], Jennifer Konopki, Brandon Lee, and Naimah Fisher were in [Holmes'] residence at 8064 Forrest Avenue in Philadelphia.[7] Konopki told [Holmes] and Lee that she knew a way for them to acquire money from a man that she used to escort who had $30,000 in his bank account. She devised a plan to tell the man that she needed him to drive her and her son back to their residence in Wilkes-Barre. [Holmes], Konopki, and Lee then left the residence, but Fisher stayed at the house along with Konopki's child.

> [7] Naimah Fisher was [Holmes]'s girlfriend at the time.

Shortly thereafter, Konopki called Robert Moir (the Complainant) on the phone. She asked him to pick her up in Philadelphia and drive her and her baby home. The Complainant agreed to help, and he met Konopki at 10th and Filbert Streets. Konopki entered the Complainant's car, but her child was not with her. Before entering the car, she asked the Complainant to stop at a K-Mart department store. They stopped at K-Mart where the Complainant bought Konopki a car seat, diapers, and baby clothes. She then asked the Complainant to drive her to 3846 North 8th Street to pick up her baby. When they arrived at the address at about 4:30 p.m., Konopki asked the Complainant to come in to meet her uncle. The Complainant complied. When the Complainant entered the house, [Holmes] and Brandon Lee immediately pushed him to the floor. **One man pointed a gun at the Complainant.**[21] [Holmes] and Lee **then covered the Complainant's head with a pillowcase**. [Holmes] and Lee carried him from the first floor down to the basement.

> [21] Both men had covered their heads with sweatshirts so that only a section of their faces from their eyebrows to their noses was exposed. The Complainant was unsure whether [Holmes] or Lee held the gun.

In the basement [Holmes] and Lee took off the Complainant's shirt, socks, and shoes. **They also tied the Complainant's legs to a chair, handcuffed, and gagged him.** Someone hit the

Complainant with a gun on the right side of his forehead and punched him in the stomach. The punch was so hard that the chair leg collapsed, and the Complainant fell to the floor. [Holmes] and Lee shouted at the Complainant and demanded his bankcard Personal Identification Number (PIN). **Konopki then came down to the basement and urged the Complainant to tell [Holmes] and Lee his PIN or they would kill him. As a result, the Complainant gave them his PIN number**. As they left the basement, one of the men told the Complainant that they would return and cut his toes off one at a time until he gave them his retirement fund. **[Holmes], Konopki, and Lee then went upstairs and left the house while the Complainant was still gagged, bound to a chair, and lying on the floor**.

Approximately five minutes after [Holmes], Konopki, and Lee left, a third man, Raheem Williams, entered the basement and told the Complainant that he would let him go. This man removed the pillowcase from the Complainant's head, untied his ropes and gave him back his sweatshirt and shoes. The Complainant's handcuffs could not be removed since the man could not find the handcuff key. The man then took the Complainant upstairs and told him to leave. The Complainant called the police from a nearby store.

At approximately 6:40 p.m., Philadelphia Police Officers Joseph Moore and Bruce Cleaver responded to the call and found the Complainant at the corner store bleeding from the head and back. The Complainant's hands were still cuffed behind his back, and his wrists were bleeding. The Complainant told Officer Moore that he had been kidnapped and robbed by several black males. The Complainant also gave a description of Konopki, his car, and the address where he had been assaulted. The officers drove the Complainant down 3846 N. 8th Street. A few minutes later, as the officers travelled northbound on 8th Street with the Complainant, Officer Moore saw [Holmes], Konopki (the driver), and Lee in the Complainant's car traveling southbound on 8th Street.[42] After Konopki parked, the officers investigated the car occupants. The Complainant subsequently positively identified each as participants in the robbery and kidnapping.[44] **The officers confiscated $610 from [Holmes]. The officers confiscated four $100 ATM withdrawal receipts in the Complainant's name from Lee. The officers also recovered a Tec-9 semi-automatic handgun loaded with 26 live rounds from the trunk of the Complainant's car**. The

Complainant identified the gun as the weapon used to beat and rob him.  Later, Fire Department personnel cut the handcuffs off the Complainant's wrists.

[42] From the time the officers met the Complainant to when the officers saw Konopki park the Complainant's car two houses from the scene was about one to two minutes.

[44] Officer Cleaver heard the Complainant identify [Holmes], Konopki, Lee, and his car.

At trial, Brandon Lee testified that [Holmes] did not know about his plan to rob the Complainant, and he owned the handgun.  Lee also testified that he and three others (Killer, Blizz, and Lump) committed the crime.

Trial Court Opinion, 3/8/18, at 2-5 (citations omitted, emphasis in original).

Holmes and Konopki were tried jointly for the above-mentioned offenses.  Prior to trial, Holmes made an oral motion to suppress the victim's on-scene identification of Holmes and argued that the officers did not have probable cause to arrest him at the scene of the incident.[2]  At the suppression

_____

[2] Holmes did not file a written motion to suppress in accordance with the Rules of Criminal Procedure.  *See* Pa.R.Crim.P. 581, 578.  At the beginning of the suppression hearing, he stated, "the Motion to Suppress will go for probable cause to arrest as well as anything seized in the car linking him to the crimes charged."  N.T., 10/24/12, at 8.  After the testimony at the suppression hearing, there was a lengthy discussion between the parties and the trial court as to whether Holmes had properly raised any suppression issues related to the identification of Holmes.  *Id.* at 38-50.  Counsel for Konopki indicated that Holmes had adopted her written motion to suppress, which had included a challenge to the identification.  *Id.* at 41.  Ultimately, Holmes elected to withdraw his request to challenge the two line-ups during the suppression hearing and proceeded to argue only that Holmes' arrest was not supported by probable cause because there was insufficient evidence to identify him as one of the perpetrators of the attack.  *Id.* at 50-53.  Our review of this issue is hampered by the fact that Holmes did not file a written motion or ensure

hearing, Officer Joseph Moore testified that he responded to a 911 call from a corner store and spoke to the victim, who reported that he had been attacked by several black males in a nearby house. Officer Moore and his partner immediately transported the victim back to the house to identify the location of the attack. As they approached the house, they saw the victim's car driving towards them. The victim's car pulled over and Holmes stepped out. Konopki and Lee were still sitting in the vehicle. Officer Moore and his partner immediately stopped Holmes, Konopki and Lee and the victim identified all three individuals as involved in the attack. They were then placed under arrest. Officer Moore testified that approximately three minutes elapsed between when he responded to the 911 call and encountered Holmes, Lee and Konopki.

The trial court denied the motion to suppress, but stated that it would place its findings of fact on the record at a later time. Officer Moore and Officer Cleaver then testified at trial that the victim had made an on-scene identification of Holmes as one of his attackers. After the jury had begun deliberations, the trial court placed its findings of fact and conclusions of law on the record. The trial court found that the officers located Holmes within

_____

that a copy of Konopki's written motion was included in the certified record on appeal. However, when it issued its findings of fact on the suppression motion, the trial court addressed the merits of the motion to suppress the victim's on-scene identification of Holmes. N.T., 11/8/12, at 106-110.

three minutes of receiving the radio call for the robbery and they observed both Holmes and Konopki inside the victim's car. The victim then immediately identified Holmes to the officers as one of his attackers. The trial court also considered the voice line-up, described *infra*, where the victim narrowed-down the possible suspects to two individuals, including Holmes. Based on all of these circumstances, the trial court concluded that the on-scene identification was sufficiently reliable to submit to the jury for consideration.

At trial, the victim was questioned extensively regarding his identification of Holmes as one of the assailants. The victim testified that the male assailants had covered their faces such that only the area from their eyebrows to their noses was visible. He saw the assailants briefly when he entered the house before they placed a cover over his head, and he saw one of the assailants again when he moved the cover to place a gag in the victim's mouth. Based on those instances, he identified Holmes, Lee and Konopki as his assailants when they were found in his car. A fourth male was found hiding inside the house where the attack took place, but the victim told officers that this individual had not been involved in the attack.

A few weeks after the incident, the victim attended a voice line-up and listened to several males recite lines that the assailants had used during the attack. The victim initially asked to listen to two of the individuals a second time, believing that the assailant was one of the two. However, after listening to all of the voices a second time, he could not positively identify any of the

individuals as one of the assailants. One of the two individuals he initially thought might have been involved in the attack was Holmes. A couple of months later, the victim attended a visual line-up in which all of the males had their faces covered in the same manner as the assailants had on the night of the attack. The victim was not able to identify any of his attackers in the visual line-up. At the preliminary hearing, the victim identified Lee as one of the attackers but was again unable to identify Holmes.

On cross-examination, the victim admitted that he could not make an in-court identification of Holmes as one of his attackers with 100 percent certainty, though he recalled that he was able to identify him as one of the individuals involved when he saw Holmes immediately after the incident.[3] The victim testified that he did recognize Holmes at the time of trial because an officer had shown him a photo of Holmes, but he did not testify as to when he was shown that photo. He did not dispute that he was unable to identify Holmes as one of the attackers at the voice line-up, visual line-up or preliminary hearing. Holmes did not move for a mistrial or other form of relief when the victim testified that he had been shown a photo of Holmes by one of the officers. N.T., 11/5/12, at 236-37.

Additionally, Fisher testified at trial that she witnessed Konopki, Lee and Holmes plan the kidnapping and robbery. Fisher had been dating and living

---

[3] The trial took place four years after the attack.

with Holmes for several years at the time of the incident. On the night of the attack, she was at his home with Holmes, Konopki and Lee, and Konopki told them that she knew a man from Wilkes-Barre who had $30,000 in a bank account. Konopki said that she could ask the man to meet her in Philadelphia, and she, Holmes and Lee planned to rob him and take his money from ATM machines. Fisher interrupted the conversation and said that the plan would not work and they should not go through with it, and Holmes told her to mind her own business and go upstairs. Fisher saw Holmes, Konopki and Lee leave the house in two vehicles twenty minutes later. She next heard from Holmes approximately two hours later when he called her and told her they had been arrested.

Fisher spoke with Holmes and Konopki by phone and letter while they were incarcerated. In one conversation with Konopki, they discussed whether Holmes and Lee were likely to talk to the police about the crime. In a conversation with Holmes, they spoke about Konopki's release from incarceration. Holmes stated that Konopki should talk to the victim and tell him not to come to the trial or ask him to sign an affidavit averring that Holmes was not involved in the attack. Holmes also sent Fisher a letter instructing her to have someone call the victim "to send the boy a message" and tell him "his life is on the line" before the trial date. N.T., 11/7/12, at 39. Finally, Fisher identified the Tec-9 that had been recovered from the victim's car at

the time of the arrests and stated that she had seen Holmes with the weapon in the past.

**B.**

Following the reception of the evidence, Holmes was found guilty of the above-mentioned offenses. The trial court sentenced him to 10 to 20 years' incarceration each for the counts of aggravated assault, robbery and kidnapping, and five years' probation for the count of persons not to possess. The sentences were imposed consecutively for an aggregate sentence of 30 to 60 years' incarceration followed by 5 years of probation. Holmes's appellate rights were twice reinstated pursuant to the Post-Conviction Relief Act,[4] and he was permitted to proceed *pro se* on appeal. Holmes and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Holmes raises various challenges to the admission and reliability of the identification evidence at trial, the non-disclosure of the photo that the victim was shown of Holmes prior to trial, the admission of Fisher's testimony, and the cumulative effect of those alleged errors. Additionally, he argues that the evidence was insufficient to support his convictions, that his convictions were against the weight of the evidence, and that he has not been provided with the preliminary hearing transcript for use in litigating this appeal. We now turn to the merits of these claims.

---

[4] 42 Pa.C.S. § 9541 *et seq.*

## II.

Holmes's first three issues on appeal relate to the identification testimony and we address them together. He first argues that the trial court abused its discretion in denying his motion to suppress the victim's on-scene identification, as the identification was unreliable and the circumstances surrounding the identification were unduly suggestive. Next, he claims that the victim's in-court identification was tainted because an officer showed the victim a photo of Holmes at some point prior to the trial. Finally, in what he frames as a *Brady*[5] claim, he argues that the Commonwealth committed prosecutorial misconduct by failing to disclose that an officer showed the victim a photo of Holmes prior to trial.

## A.

In his challenge to the trial court's ruling on his suppression motion,[6] Holmes claims that the victim's identification was unduly suggestive and

---

[5] *Brady v. Maryland*, 373 U.S. 83 (1963).

[6] Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where

- 10 -

should have been suppressed because the victim did not have an adequate opportunity to view the perpetrators during the attack, he was under significant stress during the incident, and he initially gave officers a vague description of the perpetrators.[7] We disagree.

"In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." ***Commonwealth v. Milburn***, 191 A.3d 891, 899 (Pa. Super. 2018) (citation omitted). Suppression of an identification is proper only when the procedure is "**so impermissibly suggestive** as to give rise to a very substantial likelihood of irreparable misidentification." ***Id.*** at 900 (citation omitted, emphasis in original).

> Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors. As this Court has

---

> ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

***Commonwealth v. McAdoo***, 46 A.3d 781, 783-84 (Pa. Super. 2012).

[7] Holmes also argues that the on-scene identification was tainted because before the victim made the identification, he heard the officers at the scene say that the suspects had been located inside the victim's car. As he did not present this argument during the suppression proceedings, it is waived. Pa.R.A.P. 302(a); ***Commonwealth v. Rush***, 959 A.2d 945, 949 (Pa. Super. 2008) (holding that legal theories that were not presented to the trial court may not be raised for the first time on appeal).

explained, the following factors are to be considered in determining the propriety of admitting identification evidence: the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. The corrupting effect of the suggestive identification, if any, must be weighed against these factors. Absent some special element of unfairness, a prompt "one on one" identification is not so suggestive as to give rise to an irreparable likelihood of misidentification. Indeed, we have regularly held that a prompt one-on-one identification enhances the reliability of the identification.

*Commonwealth v. Hale*, 85 A.3d 570, 574 (Pa. Super. 2014) (cleaned up).

In *Hale*, the defendant broke into the victim's home, pointed a gun at her, and forced her to put her head under a pillow and blanket before he took her television and left the house. *Id.* at 572. The defendant was apprehended approximately one hour later and detained in handcuffs while the victim was transported to the scene. *Id.* The victim rejected another individual at the scene as the perpetrator before she identified the defendant as the man who had broken into her home. *Id.* We held that the trial court did not err in denying the motion to suppress the identification, as the victim had the opportunity to view the defendant before her head was covered, little time passed between the incident and the identification, and the victim was certain at the scene that the defendant was the perpetrator. *Id.* at 575.

Here, Officer Moore testified that he responded to a radio dispatch for a robbery and carjacking and met the victim, who was handcuffed and bleeding. The victim told him that he had been attacked by several black males in black

clothing and that they were with a white female with blonde hair named Jennifer, who was known to the victim. He told the officers that the males had taken his ATM card and car keys. Officer Moore and his partner immediately put the victim in their vehicle and asked him to show them the house where the attack had taken place, which was nearby. As they drove down the street, the officers observed the victim's car approaching them from the opposite direction. The car pulled over and Holmes exited the back seat while Lee and Konopki sat in the front. Officer Moore and his partner stopped all three individuals and the victim identified them as his attackers.

Officer Moore recovered $610 in cash from Holmes and $991 in cash from Lee. In addition, Lee had four ATM withdrawal receipts documenting $100 withdrawals from the victim's bank account. The victim's wallet was recovered from inside the vehicle and the officers found the Tec-9 in the trunk of the vehicle. The victim confirmed that the Tec-9 found in the trunk of the car had been used during the attack. Officer Moore testified that three minutes elapsed between when he received the radio call and responded to the scene and when they encountered the three co-defendants in the victim's vehicle.

We conclude that the on-scene identification was sufficiently reliable and the trial court did not err in allowing the jury to hear this evidence. While the victim's head was covered during much of the attack, like the witness in *Hale*, he had the opportunity to view his attackers before they covered his face. The

victim provided the officers with a general description of his attackers before Holmes, Lee and Konopki were apprehended, and the victim was personally familiar with Konopki before the incident occurred. The identification took place mere minutes after the victim was freed and the officers received the initial report of the attack. In addition to identifying Holmes and Lee as his attackers at the scene, the victim was able to confirm that a third black male, who had been found hiding in the house, was not involved in the attack. Under these circumstances, the on-scene identification was sufficiently reliable and the trial court did not err in denying the motion to suppress.

**B.**

Next, Holmes contends that the victim's in-court identification was tainted because an officer showed the victim a photograph of Holmes at some point prior to trial. He argues that the victim's in-court identification violated due process because the photo rendered the procedure unduly suggestive. As the victim repeatedly testified at trial that he could not positively identify Holmes as one of his attackers, this claim is meritless.

On direct examination, the victim testified that after he was picked up by the police, he was taken to the area where the attack occurred where officers showed him four individuals they had apprehended. The victim testified that those individuals included Konopki, the individual who had been hiding inside the house, and two other males. The district attorney then asked the victim, "Now, today, again more than four years later, are you able to say

- 14 -

today if anyone in the courtroom was one of the males that you were shown?" N.T., 11/5/12, at 164. The victim then confirmed that he saw Holmes at the time of the on-scene identification. *Id.* The victim did not testify as to whether he recognized Holmes in court as one of the attackers. The victim also testified that he was unable to identify Holmes at the visual or voice line-ups during the course of the investigation.

On cross-examination, Holmes' attorney asked the victim how he could recognize Holmes at the time of trial when he was unable to identify him during the line-ups three years prior and the following exchange occurred:

**Q:** But now four years later you can identify Mr. Holmes and Mr. Holmes isn't even wearing a hoodie. So is it that your recollection just was so totally refreshed now?

**A:** I don't know, sir.

**Q:** I can't hear you, sir.

**A:** I don't know, sir.

**Q:** You don't know?

…

**A:** I was shown pictures of Mr. Holmes.

**Q:** When were you shown pictures of Mr. Holmes?

**A:** Like I saw him the night of when they brought the three men out to — from my car. I actually saw four persons. Fourth person, Jennifer, and the gun.

**Q:** We'll get to that.

**A:** Okay.

- 15 -

**Q:** But you're stating to me that some officer of the law or someone showed you a picture of Mr. Holmes?

**A:** Yes.

**Q:** And you said, yeah, that was him?

**A:** I don't remember what I said, sir.

**Q:** Okay. So you don't know whether you identified him or not. Somebody showed you a picture that was later identified as Holmes but you don't know if that was guy in the incident, correct?

**A:** No, sir.

**Q:** All right. Because we're only after the truth of the matter.

**A:** That's all I'm here for, sir.

**Q:** All right. So now getting back to what I was asking you to do—

**A:** Yes, sir.

**Q:** All right. You cannot 100 percent tell this jury, tell this judge and everybody in it, that Mr. Holmes was in that incident on October 24th on that house on 8th Street? You can't do that; can you?

**A:** No, sir.

**Q:** You can't?

**A:** No, sir.

**Q:** No, correct?

**A:** Yes, sir.

**Q:** That's your answer?

**A:** Yes, sir.

N.T., 11/5/12, at 236-37. Holmes' attorney did not question the victim further regarding when or in what context the officer had shown him a photo of Holmes. The victim later confirmed that when he saw Holmes at the scene, he told officers that he had been involved in the attack, but he was not able to identify Holmes in the visual line-up. N.T., 11/6/12, at 62-67.

The record reflects that the victim was unable to make an in-court identification of Holmes as one of his attackers. He testified candidly on multiple occasions that he was not able to recognize Holmes at the preliminary hearing, the visual line-up, the voice line-up or at trial, and he was thoroughly cross-examined regarding the on-scene identification. While the victim stated that an officer had shown him a photo of Holmes, he did not testify and was not asked when this event occurred, though presumably it would have been after Holmes was arrested. There is no support for Holmes' argument that the victim made a tainted in-court identification of him as a result of seeing the photo, as the victim did not identify him in court as one of his attackers at all. This claim is meritless.

## C.

Finally, Holmes claims that the Commonwealth engaged in prosecutorial misconduct by failing to disclose to the defense that the victim was shown a photo of Holmes before trial. He argues that this failure constituted a ***Brady*** violation and deprived him of due process. This claim is waived. As noted *supra*, Holmes learned during cross-examination of the victim that an officer

had shown the victim his photo at some point prior to trial. While Holmes now contends that he was deprived of a fair trial by the non-disclosure, he did not present this argument to the trial court or seek a continuance, mistrial or dismissal of the charges based on the non-disclosure. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Instead, he elected to continue with his cross-examination of the victim and challenged the credibility of the victim's on-scene identification. Because Holmes did not raise his **Brady** claim in the trial court, it is waived.[8] **Commonwealth v. Creary**, 201 A.3d 749, 752-53 (Pa. Super. 2018) (holding that the defendant waived his **Brady** argument by failing to present it to the trial court).

---

[8] Even if Holmes had properly presented his **Brady** claim to the trial court, we would conclude that no relief is due because he is unable to establish prejudice. "There are three components of a true **Brady** violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." **Commonwealth v. Natividad**, 200 A.3d 11, 26 (Pa. 2019) (quoting **Strickler v. Greene**, 527 U.S. 263, 281-82 (1999)). As discussed in Part III.B, *supra*, the victim was unable to identify Holmes as his attacker at trial despite seeing the photo of Holmes beforehand. The defense thoroughly cross-examined the victim, who admitted repeatedly that he had never positively identified Holmes as his attacker after the night in question. Because viewing the photo did not lead the victim to make any additional identification of Holmes, and Holmes was able to cross-examine the victim regarding the photo at trial, we cannot conclude that he was prejudiced when the Commonwealth did not disclose the photo prior to trial.

**III.**

Next, Holmes contends that the trial court erred by admitting Konopki's inculpatory statements which "collaterally incriminated" him when he was not afforded the opportunity to cross-examine Konopki regarding those statements.[9]  **See** Holmes's Brief at 61-63.  Holmes argues that he was deprived of his Sixth Amendment right to confront Konopki in violation of the principles established in **Bruton v. United States**, 391 U.S. 123 (1968),[10] because the statements were introduced without Konopki's testimony.

The statements at issue were admitted through Fisher's testimony, as the Commonwealth played tapes of the phone conversations Fisher had with Konopki while Konopki was incarcerated.  In the conversations, Konopki and Fisher discuss the individual, who was Holmes's cousin, who freed the victim from his restraints and let him out of the house after the attackers had left with his bank card and car.  Fisher said that she thought Konopki might talk

---

[9] While Holmes and Konopki proceeded to trial together, Konopki failed to appear on the second day of trial and was tried *in absentia.*  **See Commonwealth v. Konopki**, 1683 EDA 2013, at *3 (Pa. Super. May 21, 2015) (unpublished memorandum).

[10] In **Bruton**, the Supreme Court held that in a joint trial, a defendant's right of confrontation is violated when a non-testifying co-defendant's confession naming the defendant as a participant in the crime was admitted into evidence.  Such a confession may be admitted into evidence only if the confession "is altered to remove the defendant's name and any reference to his existence, and a proper limiting instruction is given."  **Commonwealth v. Markman**, 916 A.2d 586, 601 (Pa. 2007).  The alteration or redaction must not be in such a manner that it "clearly refers to the defendant."  **Id.**

to the police about the events, but said that Holmes and Lee would not talk to the police. In another call, Konopki told Fisher that she and Holmes did not say anything that would get Lee in trouble.

Again, this argument is waived. First, Holmes did not object to Fisher's testimony at the time of trial. While counsel for Konopki sought to exclude the phone calls on other grounds prior to and during trial, Holmes did not present his Confrontation Clause argument to the trial court or object to the admission of the phone call on any other ground. Thus, he failed to preserve this issue for appeal. Pa.R.A.P. 302(a). Second, while Holmes included a challenge to Fisher's testimony in his concise statement pursuant to Pa.R.A.P. 1925(b), he did not raise a challenge to the admission of Konopki's statements as a violation of his Confrontation Clause rights. **See** Appellant's Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal, 11/14/17, at 1-2. Because the argument he presents on appeal was not preserved in his concise statement, it is waived. Pa.R.A.P. 1925(b)(4)(vii).[11]

---

[11] Nonetheless, we note that Konopki's statements in the taped conversations with Fisher were non-testimonial. The principle in **Bruton** protects the accused's right under the Confrontation Clause to cross-examine his accusers. However, the United States Supreme Court has held that the Confrontation Clause's protections apply to testimonial statements, not non-testimonial statements. **Crawford v. Washington**, 541 U.S. 36, 51-52, 68 (2004). The "core class of testimonial statements" includes statements in "affidavits, depositions, prior testimony at a preliminary hearing, before a grand jury, or at a former trial, or given during police interrogations," but also includes statements made for the primary purpose of investigating a crime or collecting evidence for future prosecution. **See Commonwealth v. Abrue**, 11 A.3d

**IV.**

Next, Holmes contends that the cumulative prejudice of the alleged errors addressed in Parts III and IV, *supra*, deprived him of a fair trial. As we have determined that all of these alleged errors are waived or meritless, we need not consider this claim further.

**V.**

We address Holmes' next two claims together. First, Holmes asserts that the evidence was insufficient to support his convictions because the evidence did not establish beyond a reasonable doubt that he was one of the individuals involved in the attack. In the alternative, he argues that his convictions were against the weight of the evidence. Both claims are waived.

As the trial court noted in its opinion, when raising a challenge to the sufficiency of the evidence, an appellant's concise statement must identify the specific element of the crime that he alleges was not proven at trial. Pa.R.A.P. 1925(b)(4)(vii); ***Commonwealth v. Hoffman***, 198 A.3d 1112, 1125 (Pa. Super. 2018). "Such specificity is of particular importance in cases where, as

_____

484, 491-92 (Pa. Super. 2010) (quoting ***Crawford, supra***). Konopki's statements made in casual conversation with Fisher were non-testimonial and, thus, their admission was governed by the rules of evidence, not the Confrontation Clause. ***See Crawford, supra***, at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). As a result, Holmes' argument that the statements were inadmissible pursuant to ***Bruton*** has no merit.

- 21 -

here, the [a]ppellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." **Hoffman**, **supra** (citation omitted; alteration in original).

Holmes included a boilerplate challenge to the sufficiency of the evidence in his concise statement that did not alert the trial court that his challenge was based on the sufficiency of the identification evidence. **See** Appellant's Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal, 11/14/17, at 1 ("Whether the [e]vidence introduced against appellant during his trial was [s]ufficient to establish beyond a reasonable doubt the charge(s) for which he was held for court to answer?"). The trial court nonetheless attempted to address the merits of Holmes' claim in its opinion, but because Holmes did not clarify that he was challenging the evidence that supported his identification, its analysis was confined to discussing the evidence that supported the substantive elements of each offense. Trial Court Opinion, 3/8/18, at 6-11. Because Holmes' challenge was not preserved in his concise statement, this argument is waived.[12]

_____

[12] Even if Holmes had not waived appellate review of this argument, we would conclude that the evidence at trial was sufficient to establish Holmes' participation in the crimes.

> Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances

Holmes also raises a challenge to the weight of the evidence to support his convictions. A challenge to the weight of the evidence must be raised in the trial court through a motion for new trial. Pa.R.Crim.P. 607(A). "Appellate review of a weight of the evidence claim is limited to a review of the judge's exercise of discretion." ***Id.***, cmt (citing ***Commonwealth v. Widmer***, 689 A.2d 211 (Pa. 1997); ***Commonwealth v. Brown***, 648 A.2d 1177, 1189-92 (Pa. 1994)). Our review of the record confirms that while Holmes filed a post-

---

established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Cox***, 785 MDA 2018, at *4 (Pa. Super. April 22, 2020) (citation omitted). Holmes' argument is based on the assumption that a victim's identification testimony is necessary to obtain a conviction. Such a rule would preclude prosecution of the many crimes committed without eyewitnesses. The Commonwealth may meet its burden of establishing the identity of a perpetrator through other forms of evidence, including circumstantial evidence. ***Commonwealth v. Lopez***, 57 A.3d 74, 79 (Pa. Super. 2012) (citation omitted). Here, Holmes was found minutes after the attack riding in the victim's stolen vehicle with Konopki, who the victim knew to be involved in his attack, and Lee, who had ATM receipts associated with the victim's bank account on his person. The Commonwealth presented testimony from Fisher that she witnessed the three individuals planning to attack the victim and steal his bankcard, ultimately aiming to empty his retirement account of approximately $30,000. Fisher also confirmed that she had seen Holmes use the type of gun that was used in the attack on a prior occasion. The home where the attack took place belonged to one of Holmes' cousins. Finally, Holmes sent letters to Fisher from jail urging her to find someone to intimidate the victim into not coming to trial. Under all of these circumstances, the jury was entitled to conclude beyond a reasonable doubt that Holmes had participated in the crimes.

sentence motion seeking reconsideration of his sentence, he did not move for a new trial on the basis that his convictions were against the weight of the evidence. Further, a weight claim is not preserved for review when it is included in the appellant's concise statement pursuant to Pa.R.A.P. 1925(b) when the appellant failed to raise the claim in front of the trial court in an earlier motion. *Commonwealth v. Sherwood*, 982 A.2d 483, 494 (Pa. 2009). Therefore, this issue is waived.[13]

## VI.

Finally, Holmes claims that the trial court hindered his ability to litigate his appeal by refusing to provide him with a copy of the transcript of his preliminary hearing.[14] Holmes has submitted two previous applications to this court requesting that we compel the trial court to provide him with the necessary transcripts to prosecute his appeal. *See* Application for Stay of

---

[13] Nonetheless, we would hold that Holmes' convictions were not against the weight of the evidence adduced at trial. "An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Sullivan*, 820 A.2d 795, 805-06 (Pa. Super. 2003) (citation omitted). A new trial is appropriate only when the verdict "is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Olsen*, 82 A.3d 1041, 1049 (Pa. Super. 2013) (citation omitted). "[T]he evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Akhmedov*, 216 A.3d 307, 326 (Pa. Super. 2019) (*en banc*) (citation omitted). Based on the totality of the circumstances described in note 13, *supra*, the jury's verdict does not shock the conscience of the court.

[14] The preliminary hearing transcript was made part of the certified record on appeal and we have considered it in the disposition of Holmes' claims.

Appeal Proceedings and Hearing Relative to Production of Documentation for Appeal Proceedings, 7/16/18; Application for Relief, 12/24/18. We issued an order directing the trial court to ensure that Holmes was provided with the transcripts. Order, 8/28/18 (remanding to the trial court for 60 days and directing that court to provide Holmes with all notes of testimony and other documents necessary to his appeal); Order, 1/22/19 (directing trial court to comply with previous Order). The trial court responded first by assigning standby counsel to ensure he was provided with discovery. *See* Letter, 1/22/19. The trial court subsequently determined that all the requested documents had been provided to Holmes in 2015, but the Commonwealth and standby counsel agreed to provide Holmes with new copies of the documents. *Id.* Because the trial court has concluded that Holmes was provided with a copy of the transcript on two occasions, and the transcript was made part of the certified record on appeal, this issue has no merit.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/23/2020*