J-S83011-17

2018 PA Super 178

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| NIYAZZ MILBURN, Appellant | : | No. 3031 EDA 2016 |

Appeal from the Judgment of Sentence August 26, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005202-2015

BEFORE: GANTMAN, P.J., OLSON, J., and DUBOW, J.

OPINION BY DUBOW, J.:                                   **FILED JUNE 22, 2018**

Appellant, Niyazz Milburn, appeals from the Judgment of Sentence of 7½ to 20 years' incarceration following his jury conviction of Robbery, Firearms Not to be Carried Without a License, Carrying a Firearm in Public in Philadelphia, and Possession of an Instrument of Crime ("PIC").[1] Appellant challenges the denial of his Motion to Suppress Identification and Physical Evidence. After careful review, we affirm.

**BACKGROUND**

The relevant facts, as gleaned from the certified record, are as follows. On May 4, 2015 at 11:50 PM, Appellant robbed Joseph Spearman ("Spearman") at gunpoint on North Broad Street in Philadelphia, stealing Spearman's iPhone 6 and backpack containing clothing and medication. This

---

[1] 18 Pa.C.S. § 3701(a)(1); 18 Pa.C.S. § 6106(a); 18 Pa.C.S. § 6108; and 18 Pa.C.S. § 907(a), respectively.

incident occurred under a streetlight approximately five feet away from Spearman, and, thus, Spearman was able to view Appellant's face and his gun clearly. After the robbery, Appellant instructed Spearman to walk away, which he did, turning once to see Appellant with another man, later identified as Ronald Lyles. Spearman "was fairly sure"[2] Appellant and Lyles left the scene in a vehicle.

Spearman immediately called 9-1-1, giving the dispatcher a description of the assailant as African American, with a muscular build, medium complexion, and facial hair, and noted that he was wearing black jeans or sweat pants and a gray hoodie sweatshirt. When Philadelphia Police Officers Michael James and Edward Taylor responded to the 9-1-1 call, Spearman explained to Officer James that he had just been robbed by two black males, one of whom had a gun, and that Appellant had taken his iPhone 6, and his backpack, which contained Spearman's work uniform, other clothing, headphones, and medication.

Officers James and Taylor commenced surveying the neighborhood accompanied by Spearman in the police car. Utilizing the "Find My iPhone" application ("App") on Officer James's personal iPhone, Officer James and Spearman attempted to locate Spearman's iPhone.[3] However, the App was

---

[2] N.T., 6/13/16, at 34.

[3] "Find My iPhone" is a pre-installed App that utilizes cellphone tower and satellite technology to show the location of a particular iPhone when that

not able to locate the phone at that time. After coming upon a male on a bicycle who was wearing black jeans similar to the assailant's, the officers stopped the bicyclist, but Spearman indicated that the man was not the person who robbed him. The officers ceased questioning the bicyclist and continued patrolling.

Officer James again attempted to locate Spearman's iPhone 6 using his own phone's "Find My iPhone" App. This time Officer James received a notification from the App indicating that Spearman's phone was in the area of 5th Street and Erie Avenue in Philadelphia. After relaying the information over the police radio, Officer James proceeded to 5th Street and Erie Avenue. Located at that intersection is a Sunoco gas station and an A-Plus Mini Market. Upon arrival about 30 seconds after receiving the App notification, the officers saw a van driving northbound through the gas station parking lot. Police searched for, but did not see, any individuals on foot and did not see anyone inside the A-Plus Market other than the cashier.

As the van exited the lot, it turned onto Erie Avenue, nearly hitting a car traveling westbound. The police officers then followed the van as it proceeded westbound for approximately 100 feet before turning right onto the 3700 block of Randolph Street. As the van turned, it rode up on the curb and nearly hit

_____

phone is powered on. See *In re Smartphone Geolocation Data Application*, 977 F.Supp.2d 129, 137-38 (E.D.N.Y. 2013) (detailing geolocation technology). The owner of the lost iPhone enters his or her "Apple ID" and password into the searching phone.

a street sign. Suspecting that the driver was not paying attention to the road or was "nervous,"[4] Officer James then activated the police car's lights and sirens to pull the vehicle over. The van travelled another 20 to 30 feet before stopping. Only about one minute had elapsed between the time Officer James received the iPhone app notification and when he stopped the van.

Officers James and Taylor parked their vehicle behind the van and approached with their guns drawn, while Spearman remained inside the police car. The van's mini-blinds were drawn on all of the windows, except the driver's side and passenger's side front windows. Officer James instructed the driver and the individual in the front passenger seat to place their hands on the steering wheel and dashboard. The driver complied, but the passenger, later identified as Appellant, did not. After Officer Taylor observed Appellant place a small semiautomatic handgun under his seat, he removed Appellant from the vehicle, retrieved the handgun, and placed Appellant in handcuffs. At this point, Appellant was the only person the officers had removed from the car. Inside the vehicle in plain view, Officer Taylor saw a backpack, medication, clothing, and three additional occupants. Back-up police officers then arrived on the scene.

As the officers walked Appellant toward the back of the van, Spearman began jumping in his seat in the police car, pointing at Appellant, and nodding his head to indicate that he recognized Appellant as the perpetrator. Officer

---

[4] N.T., 6/13/16, at 58.

James then spoke with Spearman who emphatically confirmed that Appellant was the assailant who had robbed him. Spearman also identified the backpack, medication, and clothing found in the van as his personal belongings.

Officer James recovered an iPhone 6 from Appellant's pocket, which Appellant stated he had just purchased from someone for $10. Spearman, however, identified the phone as belonging to him, and he successfully unlocked the phone with his passcode. Officer James observed a photo of Spearman on the phone's home screen. Officer James then placed Appellant in another police vehicle.

Officers James and Taylor continued to remove the three remaining occupants from the vehicle. Spearman positively identified Ronald Lyles, a back-seat passenger, as the second assailant.[5] Spearman indicated that the other two occupants were not involved in the robbery. Spearman also indicated that an onlooker at the scene of the traffic stop was not involved in the crime.

Detectives later obtained a search warrant for the van. Upon executing the warrant, detectives found Spearman's work uniform and name tag.

The Commonwealth charged Appellant with the above crimes.[6]

---

[5] Ronald Lyles is Appellant's co-defendant, but is not a party to this appeal.

[6] The Commonwealth also charged Appellant with Conspiracy to Commit Robbery, Theft by Unlawful Taking, Receiving Stolen Property, Simple Assault,

**SUPPRESSION HEARING**

On February 21, 2016, Appellant filed an Omnibus Pretrial Motion seeking to suppress Spearman's identification of him as the perpetrator of the crime and physical evidence obtained by police. In support of his argument challenging Spearman's identification of him, Appellant argued that the identification procedures employed by police were "unduly suggestive and conducive to irreparably mistaken identification." Pretrial Motion, 2/11/26, at ¶ 4. With respect to his Motion to Suppress Physical Evidence, Appellant argued that the "arresting officer did not have probable cause" to stop and search him. *Id.* at ¶¶ 13-14.

On June 13, 2016, the suppression court held a hearing on Appellant's Motion. Officer James testifed that he has been a Philadelphia Police Officer for 10 years, assigned to patrol the 25th District. N.T., 6/13/16, at 29.[7] He stated that he initiated the instant traffic stop because, in his experience, the erratic driving, *i.e.*, nearly hitting a vehicle, driving up on a curb, and nearly hitting a street sign, indicate that the driver is, *inter alia*, "nervous." *Id.* at 58. Officer James testified that he and Officer Taylor drew their guns at the scene of the traffic stop based on experience in conducting automobile stops in that area and the information provided by Spearman. *Id.* at 39.

---

and Recklessly Endangering Another Person. 18 Pa.C.S. § 3701(a)(1), 18 Pa.C.S. § 903; 18 Pa.C.S. § 3921(a); 18 Pa.C.S. § 3925(a); 18 Pa.C.S. § 2701; and 18 Pa.C.S. § 2705, respectively.

[7] The 25th District is an area in which a large number of violent crimes occur. *See* N.T., 6/13/16, at 29.

With respect to the iPhone app, Officer James explained that he is "very familiar" with the "Find My iPhone" app, that his knowledge comes from both his personal and professional experience, and that he has used it about 25 times before. *Id*. at 52. He further testified that he has not received any outside training or any specialized instruction in the use of the app. *Id.* at 54. Further, Officer James testified that the victim emphatically and without hesitation identified Appellant as the perpetrator of the robbery. *Id.* at 20.

On June 13, 2016, the suppression court denied Appellant's Motion to Suppress.[8] Appellant proceeded to trial after which the jury convicted him of Robbery, Firearms Not to be Carried Without a License, Carrying a Firearm in Public in Philadelphia, and PIC.

On August 26, 2016, the court sentenced Appellant to an aggregate sentence of 7½ to 20 years' incarceration. Appellant did not file a Post-Sentence Motion. On September 23, 2016, he filed a direct appeal to this Court.

Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following two issues on appeal, which we have reordered for ease of disposition:

1. Did the lower [c]ourt err in denying Appellant's [M]otion to [S]uppress the illegal stop and search of the vehicle [in which

---

[8] Although not relevant to this appeal, we note that the court granted Appellant's Motion to Suppress the statement he gave after police took him into custody.

> Appellant was traveling] when police did not have reasonable suspicion to stop the van?
>
> 2. Did the lower [c]ourt err in denying Appellant's [M]otion to [S]uppress the suggestive show-up identification of [Appellant]?

Appellant's Brief at 4.

## Issue 1 – Impermissible traffic stop

In his first issue, Appellant claims that the court should have granted his Motion to Suppress evidence and preclude evidence the Commonwealth obtained from the van because the "ping" from the iPhone App was "the only information suggesting the van's occupants were the perpetrators" of the robbery. Appellant's Brief at 15. Appellant argues that this "ping" "does not arise [*sic*] to the requisite reasonable suspicion to stop and detain a suspect." *Id.* He bases this argument on the allegation, without any meaningful development, that the Find My iPhone app is "unsanctioned GPS technology" whose results are insufficient "to justify an investigatory stop of an individual." *Id.* at 13. We disagree.

We review the trial court's decision to deny a motion to suppress to determine "whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Freeman*, 150 A.3d 32, 34 (Pa. Super. 2016). Further, "[b]ecause the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Id.* We are bound by the suppression

court's factual findings where they are supported by the record, and we may reverse only if the court's legal conclusions are erroneous. *Id.* at 35. Because this Court's mandate is to determine if the suppression court properly applied the law to the facts, our scope of review is plenary. *Id.*

The Fourth Amendment of the United States Constitution and Article 1, Section 8 of our state Constitution protect citizens from unreasonable searches and seizures. *In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001). "To secure the right of citizens to be free from . . . [unreasonable searches and seizures], courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive." *Commonwealth v. Beasley*, 761 A.2d 621, 624 (Pa. Super. 2000). Our Supreme Court has defined three levels of interaction between citizens and police officers: (1) mere encounter, (2) investigative detention, and (3) custodial detention. *See Commonwealth v. Fuller*, 940 A.2d 476, 478 (Pa. Super. 2007). Here, police subjected Appellant to an investigative detention.

"[W]hen the police stop a vehicle in this Commonwealth for investigatory purposes, the vehicle, and its occupants are considered 'seized' and this seizure is subject to constitutional constraints." *Commonwealth v. Swartz*, 787 A.2d 1021, 1024 (Pa. Super. 2001). When evaluating the legality of investigative detentions, Pennsylvania has adopted the holding of *Terry v. Ohio*, 392 U.S. 1 (1968), wherein the United States Supreme Court

held that police may conduct an investigatory detention if they have reasonable suspicion that criminal activity is afoot.

"When conducting a *Terry* analysis, it is incumbent on the suppression court to inquire, based on all of the circumstances known to the officer *ex ante*, whether an objective basis for the seizure was present." **Commonwealth v. Carter**, 105 A.3d 765, 769 (Pa. Super. 2014). In order to justify an investigative detention, a police officer must be able to identify "specific and articulable facts" leading her to suspect that criminal activity is afoot. **Terry**, 392 U.S. at 21.

The assessment of whether reasonable suspicion exists for an investigatory detention requires an evaluation of the totality of the circumstances. **Commonwealth v. Gray**, 784 A.2d 137, 142 (Pa. Super. 2001). "Among the factors to be considered in establishing a basis for reasonable suspicion are tips, the reliability of the informants, time, location, and suspicious activity, including flight." **Id.** Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence." **Navarette v. California**, 134 S.Ct. 1683, 1687 (2014). **See also Commonwealth v. Fink**, 700 A.2d 447, 449 (Pa. 1997) (explaining that reasonable suspicion is less than a "certainty, a preponderance, or even a fair probability."). When evaluating whether reasonable suspicion existed in a particular case, this Court must "view the circumstances through the eyes of a trained officer, not an ordinary citizen." **Commonwealth v. Riley**, 715 A.2d 1131, 1135 (Pa. Super. 1998). "Reasonable suspicion depends upon

both the content of the information possessed by the police and its degree of reliability." ***Commonwealth v. Wiley***, 858 A.2d 1191, 1194 (Pa. Super. 2004) (citation omitted).

In the instant case, the suppression court found Officer James's observations sufficiently specific and reliable to form a reasonable suspicion that criminal activity was afoot. The facts established that Officer James received information regarding a robbery and responded to the scene within a few minutes of receiving the call. Spearman gave Officer James a detailed description of his assailants and the stolen items, including his iPhone. In addition, Spearman told officers he was "fairly sure" the perpetrators fled in a vehicle following the incident.

Due to his personal and professional experience with the "Find My iPhone" app, Officer James was able to locate Spearman's iPhone. The App tracked the missing phone to a specific location, in the area of 5th Street and Erie Avenue. Officer James's experience using the App to recover missing iPhones comes from 25 prior instances throughout his personal and professional life in which the App successfully located the missing iPhone. Given his experience with the reliability of the "Find My iPhone" app, Officer James's belief that Spearman's phone was at the indicated location was reasonable.

Only about one minute elapsed between the time Officer James received the notification of the missing phone's location and when he reached the identified location. When Officer James reached the area, he saw a van

proceeding through the parking lot of a Sunoco gas station. He did not observe any other vehicles or pedestrians. Officer James then saw the van driving erratically, from which he concluded that the operator of the van was either "nervous" or not paying attention to the road.

Officer James has been a police officer in the 25th District of the East Division for ten years. He testified that the 25th District is an area in which a high number of violent crimes occur. The neighborhood is known for gun violence, armed robberies, and open-air narcotic sales.

Officer James's conclusion that the individuals in the van that he observed in the parking lot of the A-Plus Mini Market may have been involved in criminal activity was reasonable because: (1) he had experience with the reliability of the "Find My iPhone" app; (2) he arrived quickly at the location identified by the "ping;" (3) no other vehicles or individuals were present at the location; (4) the driver of the vehicle was operating it in a manner consistent with nervousness; and (5) he knew that the "pinged" location was a high crime area.

The totality of the circumstances, of which the "Find My iPhone ping" was but one factor, establish that Officers James and Taylor had specific and articulable reasonable facts that led them to conclude that the individuals in the van were engaged in criminal activity. Thus, reasonable suspicion existed for them to conduct an investigatory detention of Appellant.

**Issue 2 - <u>Impermissibly suggestive identification</u>**

Appellant next contends that the process used to identify him was impermissibly suggestive and "irreversibly tainted any identification the complainant may have made." Appellant's Brief at 9, 12. He avers that the victim could not have sufficiently observed the assailants' faces because they were wearing hooded sweatshirts. Appellant's Brief at 12. Appellant also contends that the victim "was improperly involved with the police investigation when he rode with police and observed police recover evidence from Appellant before he [the victim] had a chance to identify him." Appellant's Brief at 9-10. He also avers that the use of the "Find my iPhone" app led the victim to conclude that the police were leading him to the perpetrator of the crime; thus, because Appellant was the only person placed in handcuffs, the victim's identification of him was tainted. *Id*. at 12.

"In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." *Commonwealth v. Brown*, 23 A.3d 544, 558 (Pa. Super. 2011) (*en banc*). Our Supreme Court has held that on-scene identifications are not only consistent with due process but also enhance the reliability of identifications as they occur when events are fresh in a witness's mind. *Commonwealth v. Turner*, 314 A.2d 496, 498-99 (Pa. 1974).

In deciding whether to admit contested identification evidence, the trial court must consider: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy

of his prior description of the perpetrator at the confrontation; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and confrontation. **Commonwealth v. Moye**, 836 A.2d 973, 976 (Pa. Super. 2003). "Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors." **Brown**, **supra**.

The suppression court may suppress an out-of-court identification only where, after considering all the relevant circumstances, "the facts demonstrate that the identification procedure was **so impermissibly suggestive** as to give rise to a very substantial likelihood of irreparable misidentification." **Commonwealth v. Kendricks**, 30 A.3d 499, 504 (Pa. Super. 2011) (citation omitted and emphasis added). The most important factor in addressing the reliability of an identification is the witness's opportunity to observe the perpetrator at the time of the crime. **Commonwealth v. Edwards**, 762 A.2d 382, 391 (Pa. Super. 2000).

Here, Appellant states that the "show-up identification was unduly suggestive, there is no independent basis for an in-court identification, and the trial court erred in denying Appellant's motion to suppress." Appellant's Brief at 12. We disagree.

Our review of the record reveals that the identification procedure employed in the instant case was consistent with due process and the identification was not the result of impermissibly suggestive methods. First, contrary to Appellant's contention, Spearman had ample opportunity to view

Appellant's unobstructed face during the commission of the crime as it took place in a well-lit area over a period of 30-35 seconds. When reporting the robbery, Spearman described the perpetrator as wearing a hooded sweatshirt, and, thus, Appellant's face was not covered. Given the lighting, the proximity of the men to each other, and Appellant's uncovered face, Spearman was able to view Appellant at the time of the crime.

The record also indicates that Spearman was focused and attentive during the gunpoint robbery and he was able to describe the perpetrator in detail immediately following the incident to both the 9-1-1 dispatcher and the responding police officers. Spearman exhibited a high degree of certainty when he promptly and spontaneously recognized Appellant as his assailant and indicated to Officers James and Taylor that they had apprehended the right person by jumping in his seat, shouting, nodding, and pointing enthusiastically at Appellant as he exited the van. Moreover, the chronology of events indicates that, contrary to Appellant's assertion, Spearman identified Appellant prior to knowing that police had recovered his iPhone from Appellant's pocket or seeing Appellant's gun.

Last, mere minutes passed between the time of the crime and Spearman's identification of Appellant as the perpetrator.

Appellant's argument that police acted suggestively by separating Appellant from the other suspects and placing only Appellant in handcuffs likewise lacks merit. The record indicates that police removed each occupant of the van one-by-one in order to eliminate any possibility of impropriety and

had handcuffed Appellant, and not the other occupants, because Appellant was the only person observed handling a gun.

Next, Appellant's contention—that the identification procedure followed by police was suggestive or that Spearman was susceptible to suggestion because of the use of the iPhone app—is belied by the record. Initially, officers stopped a potential suspect riding a bicycle in the area of the crime. After looking at that man's face, Spearman immediately knew he was not the assailant. Further, Spearman indicated to police that an onlooker at the scene of the van-stop was not involved in the crime. Last, Spearman told police that the men in the van, other than Appellant and Lyles, were also not involved. The record reflects that Spearman was not a victim who would identify just anyone as involved in the robbery.

Here, we conclude that the suppression court's factual findings are supported by the record and its legal conclusions are correct. There is no indication under the facts of this case that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. To the contrary, under the totality of the circumstances, particularly the evidence that Spearman had ample opportunity to see Appellant's face and the proximity in time between the incident and Spearman's identification of Appellant as its perpetrator, we find that the court appropriately permitted the admission of the identification evidence.

In light of this conclusion, we need not address Appellant's argument that the court should have suppressed Spearman's in-court identification. ***See Commonwealth v. DeJesus***, 820 A.2d 102, 113 (Pa. 2004) (explaining that where an appellant fails to establish that an out-of-court identification was impermissibly tainted, it is not necessary for the reviewing court to address the derivative assertion that an in-court identification should have been suppressed).

Judgment of Sentence affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/18