J-S11028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN R. LAMBERT | : | |
| | : | |
| Appellant | : | No. 1673 EDA 2023 |

Appeal from the PCRA Order Entered June 12, 2023
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-000315-2018

BEFORE:   BOWES, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:                **FILED JULY 19, 2024**

Jonathan R. Lambert appeals from the order denying his Post Conviction

Relief Act ("PCRA") petition. **See** 42 Pa.C.S.A. §§ 9541-9546. Lambert argues

his trial counsel was ineffective for failing to argue at the suppression hearing

that the police lacked reasonable suspicion to stop the vehicle in which

Lambert was a passenger. We affirm.

The trial court briefly summarized the underlying facts as follows.

> The facts of this matter in a nutshell are that [Lambert]
> participated in a conspiracy to commit Burglary and other related
> offenses in Coatesville, Chester County, Pennsylvania over the
> course of six (6) days from November 18, 2017[,] through
> November 23, 2017. [Lambert]'s participation was revealed in two
> (2) recorded phone calls he received from his brother, Douglas
> Lambert [("Douglas")], who was in prison when he made these
> and other recorded calls to the members of the conspiracy,
> surveillance conducted by the Coatesville Police Department upon
> their receipt of the records of these calls, and [Lambert]'s

_____

[*] Retired Senior Judge assigned to the Superior Court.

presence with two (2) of the co-conspirators during a traffic stop at approximately 11:30 p.m. on the night of November 23, 2017, Thanksgiving night, during which stop various tools, including ski masks, wire bolt cutters, night-vision goggles, machetes, and other implements utilized in burglaries were found in the car. [Lambert] was taken into custody. No burglary was ever consummated.

Trial Court Opinion, filed 2/27/20, at 1-2. The Commonwealth charged Lambert with conspiracy to commit burglary and related charges. His case was joined with those of his three co-defendants, Douglas, William Roussos, and Lee Fitzgerald Wilson.

Lambert and Roussos both moved to suppress. Lambert's motion contended that "[t]he evidence was obtained because of the unlawful arrest made without probable cause to search or to make a legal arrest," and police had searched the vehicle without a warrant and the search "did not fall under an established exception." Motion to Suppress, 5/4/2018, at 3-4.

At the beginning of the suppression hearing, the court denied Lambert's motion as a matter of law. The court found Lambert lacked standing to challenge the search of Roussos's vehicle because Roussos had consented to the search after the vehicle was stopped. *See* N.T., 10/29/18, at 13; Trial Ct. Op. at 39-40. The order denying the motion to suppress found that the police had reasonable suspicion to stop the vehicle. *See* Order, filed 2/28/19, at 3-5 n.1.[1]

_____

[1] However, the court later stated in its opinion that the part of the order finding reasonable suspicion was a "nullity" because the court had dismissed Lambert's motion as a matter of law at the commencement of the suppression *(Footnote Continued Next Page)*

The hearing proceeded on Roussos's motion. Roussos and the Commonwealth stipulated that the court could primarily rely on the testimony at the preliminary hearing. The court summarized the preliminary hearing testimony, relaying the facts leading up to the traffic stop, as follows.

> At the Preliminary Hearing, the Affiant, Detective Jonathan Shave of the Coatesville City Police Department, testified that on November 20, 2017[,] he received a phone call from Parkesburg Detective Ryan Murtaugh who explained to Detective Shave that he was handling an investigation and had obtained certain recorded prison phone calls which, it may be inferred, might be of interest to Detective Shave. Detective Shave obtained the recording from Detective Murtagh on November 20, 2017. When Detective Shave listened to the recordings, he recognized the voice of one Douglas Lambert speaking to another unidentified individual. Detective Shave knew Douglas Lambert's voice from prior investigations involving him. Detective Shave was able to identify that the phone calls originated from the prison where Douglas Lambert was incarcerated at the time.

> The first phone call Detective Shave received occurred on November 18, 2017. The phone call was between Douglas Lambert and another person whom Detective Shave was later able to identify via the number called as William Roussos. Through an investigation with the prison, Detective Shave learned that Douglas Lambert and William Roussos had been prison cellmates. As noted above, the call originated from Douglas Lambert at the prison to Mr. Roussos'[s] phone.

> In this first phone call, Detective Shave heard Douglas Lambert ask Mr. Roussos questions about "helping me out." As the call progressed, Detective Shave heard Douglas Lambert state to Mr. Roussos, "Do you remember that situation that we discussed when you were here" and that "that situation is a go." Mr. Roussos responded by saying "Thank you very much. I really

_____

hearing. **See** Trial Ct. Op. at 40. Nonetheless, the court explained in the opinion that even if it had not ruled that Lambert had lacked standing, it would have denied the suppression motion because the record was sufficient to support the stop. **Id.** at 45, 47.

- 3 -

need that right now." Detective Shave testified that when he heard this phone call, he did not understand to what the men were referring.

Detective Shave next reviewed three (3) to four (4) calls that occurred on November 19, 2017, two (2) of which were significant to the present matter. The first of the batch constituted a call from Douglas Lambert to Mr. Roussos. In this call, Douglas Lambert tells Mr. Roussos that "[his] peoples just got out." Detective Shave did not know at his time what Douglas Lambert meant. Detective Shave testified that he heard Douglas Lambert tell Mr. Roussos that Mr. Roussos ["]needed to get in touch with the person who had just got out and,["] as Detective Shave testified, and explain ["]the situation["] to him, because Douglas Lambert ["]was not able to talk over the phone." Again, Detective Shave did not at this time know what the "situation" was.

The second call of interest that occurred on November 19, 2017[,] was a call again made by Douglas Lambert to William Roussos in the evening of that day, which was a Sunday. During this call, Douglas Lambert advised Mr. Roussos "that he would need to go out to a location and scout out and get a feel for what he was going to do." As the call progressed, Detective Shave heard Mr. Roussos tell Douglas Lambert that he was "probably going to go out tonight after the game, around midnight to get ice cream, if the place is open late." Unaware of any establishment in the area that sold ice cream at midnight, Detective Shave testified that he was suspicious of Mr. Roussos'[s] statement. Based on his training and experience as a law enforcement officer, Detective Shave thought the two (2) men were speaking in code, that is, using words and phrases to make what the true intention of the discussion is about.

Next, Detective Shave reviewed phone calls from Douglas Lambert that took place on November 20, 2017. The first of these calls, and the only one from that day that appears to be relevant to the instant proceedings, was a phone call made from Douglas Lambert to Mr. Roussos at 8:45 a.m. The first thing that Mr. Lambert said to Mr. Roussos was, "Tell me good news", to which Mr. Roussos replied, "We need to go again." Douglas Lambert then stated, "You guys didn't go?" Mr. Roussos explained that "they" did go, but they encountered some things they did not expect. When asked by Douglas Lambert what they encountered, Mr. Roussos replied that "we encountered horses and an old lady that

- 4 -

was acting weird. Just things we didn't expect. We have to go again."

Detective Shave next reviewed calls that occurred on November 21, 2017. One of these calls was a call from Douglas Lambert to Mr. Roussos wherein they "were discussing the possibility of Thanksgiving Eve, there were going to be a lot of people out." Mr. Roussos told Douglas Lambert that "he had an appointment to go to see his PO and he would be getting an ankle bracelet and he described that he would be concerned with his ability to make movement—his ability to move." Detective Shave testified that Thanksgiving Eve in 2017 was November 22, 2017.

In a call that occurred either on November 21, 2017[,] or November 22, 2017, Detective Shave observed that Douglas Lambert called another number that Detective Shave was able to determine belonged to the [d]efendant, Jonathan Lambert. Detective Shave learned that [Lambert] was Douglas Lambert's brother and that [Lambert] had just been released from Chester County Prison on November 19, 2017. Based upon this information, Detective Shave inferred that Douglas Lambert must have been referring to his brother, [Lambert], when he stated to Mr. Roussos on November 19, 2017[,] that his "people just got out."

In Douglas Lambert's call to [Lambert] made on either November 21, 2017[,] or November 22, 2017, Douglas Lambert asked [Lambert] "if everything is going okay." Detective Shave testified that [Lambert] was "clearly agitated in the phone call." [Lambert] stated to Douglas Lambert, "Yo, your man is blingin. I'm thinking he might have went and done it hisself." Detective Shave testified that he believed [Lambert] was referring to Mr. Roussos. Detective Shave testified that he did not know what [Lambert] meant by his statement that something had been done by Douglas Lambert's "man"; that is, Detective Shave did not yet know what that something was.

In this phone call, Detective Shave heard [Lambert] telling Douglas Lambert that "he was concerned." [Lambert] stated, "[Y]our man is blingin. I'm getting concerned he is going to go and do the job himself." [Lambert] then stated, "I'm thinking about taking the young boys, Little Lee, Little Prince and going and doing it myself, if you give me the green light. One will come in with me, one will be the lookout." Detective Shave testified that he believed that "Little Lee" was a reference to co-defendant Lee

Fitzgerald Wilson. At the time of the Preliminary Hearing, Detective Shave did not know who "Little Prince" was. Detective Shave testified that the way the men's conversation sounded, it appeared that the "job" was going to be done on the night of November 22, 2017.

The date of the next phone call that Detective Shave reviewed was November 23, 2017. The call was made in the morning from Douglas Lambert to Mr. Roussos. In this phone call, Douglas Lambert asked Mr. Roussos what happened the night before. Detective Shave testified that Mr. Roussos sounded confused and replied, "What are you talking about?" Douglas Lambert said, "Come on, man, you know what's going on. You were supposed to do it last night." Mr. Roussos replied, "I thought it was for tonight", to which Douglas Lambert responded, "Oh, you thought it was for tonight?" The phone call was then disconnected.

Douglas Lambert then calls his brother, [Lambert]. Douglas Lambert tells [Lambert], "I just talked to him. He said it's on for tonight." [Lambert] replied, "Oh, yeah, I already talked to him. It's on." Detective Shave testified that the night of November 23, 2017[,] was Thanksgiving night. At approximately 8:00 p.m. on November 23, 2017, Douglas Lambert again called [Lambert]. Detective Shave testified that in this phone call, Douglas Lambert can be heard several times stating to [Lambert], "I just want you to be careful tonight. I'll be thinking about you and make sure you are dressed for the occasion."

On November 23, 2017, after reviewing these prison phone calls, Detective Shave, Detective Murtagh, and Coatesville City Police Corporal Ken Michaels, along with several Pennsylvania State Troopers, established surveillance of [Lambert], who was with Lee Fitzgerald Wilson at an establishment called the West End Tavern at the time. The police also surveilled William Roussos, who was at his residence in Parkesburg. The police set up the surveillance because the phone calls indicated that the trio were involved in something, that the "something" in which they were involved was going to take place that night, and they wanted to follow the men to determine what it was that they were doing.

The police observed [Lambert] and Mr. Wilson leaving the West End Tavern at approximately 11:30 p.m., roughly fifteen (15) to twenty (20) minutes after the police arrived. Detective Shave could not recall whether he observed [Lambert] carrying anything when he left the bar. Mr. Wilson got into his car;

[Lambert] got into a different car. Both proceeded southbound on Strode Avenue to Snake Road to 1241 Youngsburg Road, which is [Lambert]'s residence. They both entered [Lambert]'s residence. Detective Shave did not observe either man to be carrying anything when they entered [Lambert]'s residence.

Police surveillance of Mr. Roussos showed Mr. Roussos leaving his residence in Parkesburg and traveling to [Lambert]'s residence at 1241 Youngsburg Road. Detective Shave was not aware of Mr. Roussos carrying anything with him into the [Lambert]'s residence. Detective Shave did not see any of the three (3) men carrying anything when they eventually exited [Lambert]'s residence. Detective Shave observed the three (3) men enter Mr. Roussos'[s] Jeep and drive southbound on Youngsburg Road. The police followed the Jeep. They observed the Jeep travel to Buck Run Road, turn northbound on Doe Run Road, turn onto Snake Road, go back to Youngsburg Road, take Youngsburg Road to Strasburg Road, then drive to Park Alley, finally reaching Valley Road. Detective Shave testified that the Jeep traveled at the speed limit, which was twenty-five (25) miles per hour.

Trial Ct. Op. at 12-20 (citations to N.T. omitted).

Roussos also supplemented the transcript of the preliminary hearing with the testimony of Corporal Kenneth Michaels, Jr., and Detective Jonathan Shave. Corporal Michaels testified that he pulled Roussos's vehicle over at the direction of Detective Shave, who had told him it was driving erratically. N.T., 10/29/18, at 20, 23.

Detective Shave testified that he had been conducting surveillance of Roussos's vehicle in an unmarked police vehicle because he believed, based on the prison phone calls, that the defendants were involved in a conspiracy to commit burglary. *Id.* at 30-31, 36. He stated Roussos's vehicle went in a circular route, as he described at the preliminary hearing. *Id.* at 34. He also

stated he "observed driving behavior that appeared to me they were trying to lose any type of car that was following them":

> For example, when the car turned off of Buck Run Road onto Snake Road, I recall that the car was coming down to Buck Run Road and I believe it put its left turn signal on and made a quick right onto Snake Road. For us conducting surveillance, it would have been obvious that we were following the car if we turned onto Snake Road, so we had to radio to another surveillance unit that they had just turned onto Snake Road.
>
> Additionally, I don't recall the officer, I believe it was Corporal Shannon Miller, was following the vehicle on Park Alley. She indicated that the vehicle was accelerating speed. These are tactics, in my training and experience, that are used by people who are trying to avoid surveillance.

*Id.* at 35. He testified that he did not observe any specific vehicle code violations but suspected that the car was "driving erratically in an attempt to avoid surveillance." *Id.* at 37-38. Detective Shave testified that he believed that if the vehicle was "successful in losing the surveillance units, they would have been able to successfully complete the burglary that they were planning." *Id.* at 36. The court denied Roussos's motion to suppress.

Following a six-day trial, the jury convicted Lambert of criminal use of a communication facility, possessing instruments of crime, criminal conspiracy to commit burglary, criminal conspiracy to commit criminal trespass, criminal conspiracy to commit possessing instruments of crime, and criminal

- 8 -

conspiracy to commit theft by unlawful taking.[2] The court sentenced Lambert to an aggregate of four to nine years' incarceration plus probation.

Lambert filed a direct appeal, and we affirmed. Relevant here, Lambert argued the court had erred in denying his motion to suppress because, he alleged, the vehicle stop was illegal. This Court found that Lambert's counsel had waived the issue by failing to argue in the trial court that the police lacked reasonable suspicion or probable cause to stop the vehicle, and by failing to challenge the voluntariness of Roussos's consent to the search. We also found that Lambert waived the issue because he had not challenged on appeal the erroneous conclusion that he had lacked standing. *See Commonwealth v. Lambert*, No. 3563 EDA 2019, 2020 WL 5684193, at *7 (Pa.Super., filed Sept. 24, 2020) (unpublished memorandum). Lambert did not seek allowance of appeal.

Lambert timely filed the instant PCRA petition through counsel on October 25, 2021,[3] and, with leave from the PCRA court, subsequently filed an amended petition. The amended petition asserted his trial counsel was ineffective for failing to argue for suppression based on the allegedly illegal stop of Roussos's vehicle.[4]

---

[2] *See* 18 Pa.C.S.A. §§ 7512(a); 907(a); 903(a)(1) and (2) (of 3502(a)(4)); 903(a)(1) and (2) (of 3503(a)(1)(ii)); 903(a)(1) and (2) (of 907(a)); and 903(a)(1) and (2) (of 3921(a)), respectively.

[3] October 24, 2021, fell on a Sunday. *See* 1 Pa.C.S.A. § 1908.

[4] Lambert also raised an ineffectiveness claim regarding the redaction of Roussos's police interview, which he has since abandoned.

The court issued notice of its intent to dismiss the petition without a hearing. Lambert did not respond, and the court dismissed the petition. The PCRA court found trial counsel had not been ineffective, because there had been reasonable suspicion to support the stop of the vehicle:

> As a result of their intercept of numerous recorded prison phone calls between [Lambert], Mr. Roussos, and Douglas Lambert over multiple days leading up to the crimes, their subsequent surveillance of the three co-defendants, [Lambert], Mr. Roussos, and Lee Wilson, who were not incarcerated at the time of the crimes, and their following of Mr. Roussos' vehicle and observation of that vehicle making what was described as an evasive maneuver to lose the police tail, the police had ample reasonable suspicion that criminal activity was afoot so as to justify the stop of Mr. Roussos' vehicle for investigatory purposes. Consequently, even had trial counsel preserved a challenge to the validity of the stop of Mr. Roussos' vehicle, it would have been denied for lack of merit.

PCRA Court Opinion, filed 8/24/23, at 20.

Lambert appealed. He raises one issue: "Did the PCRA Court err when it dismissed [Lambert's] claim that trial counsel was ineffective for failing to seek suppression of items found in a vehicle that [Lambert] was a passenger in where the police lacked reasonable suspicion to effectuate the traffic stop?" Lambert's Br. at 4.

Lambert argues that his trial counsel was ineffective for failing to argue that the police lacked reasonable suspicion to stop Roussos's vehicle. He points out that Corporal Michaels testified at the suppression hearing that he stopped the vehicle because Detective Shave had observed "erratic" driving. However, Lambert argues, Corporal Michaels had not observed any traffic

violations himself, and neither officer articulated what was erratic about Roussos's driving. Lambert also argues that while Detective Shave testified that he suspected the vehicle was driving erratically to avoid surveillance by the police, the police had been driving unmarked vehicles. Lambert therefore contends Detective Shave's assertion that vehicle was driving erratically to avoid apprehension is unsupported by the record.

"When reviewing the denial of PCRA relief, we consider whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." **Commonwealth v. Midgley**, 289 A.3d 1111, 1118 (Pa.Super. 2023) (internal quotation marks and citation omitted).

"Counsel is presumed to be effective." **Id.** at 1119. A petitioner can only overcome this presumption by proving, "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." **Id.** (citation omitted).

Contrary to Lambert's argument, the police did not stop the vehicle for a moving violation due to erratic driving, but on suspicion that the occupants were about to commit a robbery. The PCRA court found that suspicion was reasonable, based on the prison phone calls and the police observation of the vehicle's evasive maneuvering.

We agree that the stop was supported by reasonable suspicion of criminal activity. "Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." ***Commonwealth v. Milburn***, 191 A.3d 891, 898 (Pa.Super. 2018) (internal quotation marks and citation omitted). Reasonable suspicion to justify an investigative detention exists where the police are able "to point to 'specific and articulable facts'" that lead to them "to suspect criminal activity is afoot." ***Commonwealth v. Butler***, 194 A.3d 145, 148 (Pa.Super. 2018) (citation omitted). A court must consider the totality of the circumstances and give due weight "to the specific, reasonable inferences drawn from the facts in light of the officer's experience." ***Id.*** (citation omitted).

Moreover, "[m]erely because a suspect's activity may be consistent with innocent behavior does not alone make detention and limited investigation illegal." ***Commonwealth v. Riley***, 715 A.2d 1131, 1135 (Pa.Super. 1998). Rather, we consider the trained officer's "consideration of modes or patterns of operation of certain kinds of lawbreakers." ***Id.*** "[A] combination of circumstances, none of which taken alone would justify a stop, may be sufficient to achieve a reasonable suspicion." ***Id.***

Here, Detective Shave articulated specific facts that led him to believe the occupants of Roussos's vehicle had conspired to commit a burglary. He described the defendants speaking in "code" on the prison calls and discussing a "job" that would take place that night. The job required "scout[ing] out" the location beforehand and required one of the men to act as a "lookout."

- 12 -

Roussos had stated he was concerned that an ankle bracelet would interfere with his ability to participate, and a first attempt had failed after some of the participants encountered, late at night, "horses and an old lady that was acting weird." **See generally** Trial Ct. Op. at 12-20.

Detective Shave also testified why he believed the occupants of the vehicle were trying to evade observation: after the defendants started driving together in Roussos's vehicle that evening, they drove in a large circle. When the vehicle was being followed by Detective Shave, it put its left turn signal on, but then quickly turned right. When another police car began to follow it, the vehicle accelerated. These facts, in combination, and considering Detective Shave's perspective as an officer, gave rise to a reasonable suspicion that the occupants of the vehicle were on their way to commit a burglary. Stopping the vehicle to investigate this suspicion was not unlawful.

The fact that the police were in unmarked cars when Roussos's vehicle attempted to evade detection does not negate this analysis. The defendants might have suspected they were being followed by unmarked police cars or might have been attempting to avoid being observed by anyone at all.

As Lambert has failed to establish that he would have prevailed on his motion to suppress, had counsel challenged the legality of the vehicle stop, he has failed to prove his counsel was ineffective. **See Midgley**, 289 A.3d at 1120 ("Trial counsel was not ineffective for failing to raise the meritless issue").

Order affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>7/19/2024</u>