J-S06005-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EDDIE STEWARD MONTGOMERY | : | No. 863 WDA 2025 |

Appeal from the Order Entered June 26, 2025
In the Court of Common Pleas of Venango County Criminal Division at
No(s): CP-61-CR-0000321-2024

BEFORE:   KUNSELMAN, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED: May 27, 2026**

The Commonwealth appeals from the order granting suppression in its case against Eddie Montgomery.  Because the police had probable cause to stop the vehicle in which Montgomery was a passenger, we reverse and remand for further proceedings.

On June 4, 2024, police arrested Montgomery and charged him with corrupt organizations, conspiracy, criminal use of a communication facility, and drug crimes.[1]  Montgomery moved to suppress evidence, claiming in relevant part that the stop of the vehicle in which he was a passenger was not supported by reasonable suspicion or probable cause.  The motion proceeded to a suppression hearing on January 16, 2025, and March 6, 2025.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 911(b)(4) and (b)(3), 903(a)(1), and 7512(a), 35 P.S. § 780-113(a)(30), (a)(16), and (a)(32).

The suppression court later entered factual findings:

The following facts are established from the record, particularly from the testimony of Agent Zackary McGranahan and Agent Stephen Martinec from the Office of the Attorney General and testimony from Sugarcreek Police Chief Bob Wenner, who at all relevant times were agents in the Attorney General's Joint Drug Strike Force ("Strike Force"). . . . [F]rom December 2023 to June 4, 2024, Strike Force agents began an investigation based on information from a confidential informant regarding suspected drug activity occurring out of an apartment building located at 151 Plum Street, Oil City, Pennsylvania ("Plum Apartments").

Using this information, Strike Force agents began to conduct surveillance on the Plum Apartments. Over the course of several weeks, investigators engaged in stakeouts, controlled buys, and interviews with confidential informants. Strike Force agents observed on several occasions the same heavyset black male engage in hand-to-hand drug sale transactions in Plum Apartments.

Upon observing these transactions, Strike Force agents developed a confidential informant ("the CI") to conduct controlled buys. During these buys the CI would call a 313-463-[xxxx] phone number ("the 313 number"), and an individual identified as "V" answered the phone. The CI would request "a couple" (a code word for cocaine), and a short time later an individual identified as "B" would exit the Plum Apartments to consummate the sale of drugs.[Note 1] B would either initiate the sale right outside of the Plum Apartments or in a car as the buyer drove around the block.

Note 1 At this time in the investigation, Strike Force agents were unaware if B and V were different people or the same person.

This process was later confirmed by Agent Martinec who was undercover with the CI during a controlled buy on a certain date in May 2024. Agent Martinec testified to personally observing the CI dial the 313 number, hearing the CI talk to a person identified as V, and then watching a person identified as B exit the Plum Apartments and consummate the sale of drugs. Agent Martinec testified to being present when B got into the car and observing the money being exchanged for crack cocaine. The CI provided the crack cocaine to Agent Martinec following the controlled buy.

On May 30, 2024, Strike Force agents applied for a pen register trap and trace pursuant to 18 Pa.C.S. § 5743 and § 5772 for the 313 number. In the application, the Strike Force agents requested a detailed record of all incoming/outgoing calls, Caller ID information, punch list information, mobile communication tracking,[Note 2] and cell site location information (also referred to as "ping information").[Note 3] In the Affidavit of Probable Cause, the Commonwealth detailed the information described above concerning the use of the 313 number, the subsequent sale of drugs, and Agent Martinec's personal observation of these transactions. Based on this information, the court granted the Commonwealth's application on May 30, 2024.

---

Note 2 "Mobile communication tracking information" is defined as "information generated by a communication common carrier or a communication service which indicates the location of an electronic device supported by the communication common carrier or communication service." 18 Pa.C.S. § 5702.

Note 3 Cell-site location information, also known as CSLI or "ping information," is information collected and stored by wireless carriers when a user's cell phone connects to a specific radio antenna, or cell site. *Commonwealth v. Salley*, 324 A.3d 1256, [2024 WL 3508005,] n.3 (Pa. Super. 2024) [non-precedential decision]. Real-time CSLI is "obtained when the wireless service provider sends a command signal to the targeted cell phone to activate the phone's location subsystem and then provides the current location of the phone to law enforcement, [whereas] historical CSLI is automatically generated and routinely collected by wireless service providers each time a cell phone connects to a cell tower." *Commonwealth v. Pacheco*, 263 A.3d 626, 635 n.9 (Pa. 2021).

---

Following the implementation of the pen register and trap and trace on the 313 number, Strike Force agents, utilizing computers in Venango County, observed the ping location in Detroit, Michigan. Strike Force agents received ping location information every fifteen minutes. Strike Force agents were also able to observe limited historical data. The data showed incoming calls to the 313 number and then almost immediately outgoing calls from the 313 number to a 586-551-[xxxx] number.[Note 4] These calls corresponded with controlled buys observed by Strike Force surveillance teams. Following the calls between the 313

number and the 586 number as observed on the pen register, the CI received a call from the 313 number and was directed to go to the Plum Apartments where the drugs would ultimately be delivered. From the data and its corresponding nature to the controlled buys, Strike Force agents confirmed the 313 number's role in coordinating the sale of drugs. Despite requests to the service provider, Strike Force agents were unable to determine the owner of the 313 number through carrier documents.

---

Note 4 The 586 number was later determined to be the phone number for Allen Griffin, also known as B, who was observed by Strike Force agents selling drugs out of the Plum Apartments.

---

Strike Force agents testified to conducting a CLEAR software search to determine the owner of the 313 number. A clear search accesses "open-source data" (data publicly available on the Internet) to provide information that may indicate the owner of the phone. The search yielded multiple names associated with the 313 number including the names of Ethan Montgomery and Eddie Montgomery.[Note 5] At this point in the investigation, Strike Force agents did not know who owned the phone. Furthermore, Agent McGranahan testified that in his training and experience, drug dealers often used aliases. Agents then acquired a photo for Eddie Montgomery but did not take any further measures to verify that Eddie Montgomery was the owner of the phone, was the person using the phone, or that the photograph they obtained was [actually] the Defendant[, Eddie Montgomery].

---

Note 5 No documentation was preserved by the Strike Force agents to verify the names revealed by the CLEAR search.

---

Agent McGranahan testified that on June 4, 2024, he discovered that the ping location data from the pen register trap and trace for the 313 number was moving along Interstate 80 eastbound toward Venango County. Strike Force agents then began surveillance of the 313 number's location as it updated every fifteen minutes. As the ping moved closer to Oil City, Agent Martinec and Agent McGranahan set up in two undercover vehicles at the Route 8/Barkeyville exit on Interstate 80 with the intention of tracking the ping. Chief Wenner was stationed in a third undercover car in Franklin, seventeen miles away. Strike Force testimony established that the ping did not provide real-time movements or provide exact location information but the ping location updated every fifteen minutes.

The Court received varying testimony about the accuracy of the ping information from the trap and trace device.

[The prosecutor]: What is ping information?

Agent Martinec: The phone hits towers and it hits one or two different towers, or whatever's in the area, and it triangulates a general location of where the phone is, up to sometimes one hundred meters but up to sometimes three thousand meters.

Agent Martinec later testified to the following:

[The prosecutor]: You said the pings are between one hundred and one thousand meters as far as accuracy?

Agent Martinec: Yeah, depending on tower location and the number of towers.

Chief Wenner testified to the following:

[The prosecutor]: You don't know exactly where this vehicle is at? You know the general vicinity within one hundred feet, correct?

Agent Martinec: Yes, sir.

Taken together, the ping may be a minimum of 100 feet to a maximum of 3,000 meters from the actual physical location of the phone. No testimony was given about how accurate the ping information was in correlation to the 313 number on June 4, 2024. The record contains no reference to any Strike Force agent's knowledge or familiarity with accuracy of the ping location in the relevant geographic area.

At around 7:30 p.m. on June 4, 2024, Strike Force agents testified that they were "right under the ping" and concurrently observed a white Chevrolet Malibu ("the Malibu") with Michigan plates exit Interstate 80 and drive northeast on Route 8 toward Oil City. Strike Force agents did not testify to observing any other cars with Michigan plates exiting the highway or if any other cars traveled on Route 8 during this time. Strike Force agents testified that they were able to see two black individuals in the car when it passed their location but could not identify anyone in the car.

Strike Force agents followed the Malibu toward Oil City. During this time, Agent Martinec spoke with a non-identified confidential informant[2] who indicated that the phone had "gone silent" and something was going on. The CI indicated this could mean a resupply of drugs (also known as a "re-up") was occurring. After the ping in the area of Barkeyville, a subsequent ping indicated the phone was in Franklin, Pennsylvania near 13th Street. At this time Chief Wenner had joined the undercover surveillance units following the Malibu. At approximately 7:50 p.m., the Malibu made a left turn into the intersection of Liberty Street on to Route 8 North in Franklin, an area known locally as "Washington Crossing." This area is significant because it is the last major turn on the route to Oil City. Strike Force agents observed no traffic violations at any point during their surveillance prior to the stop at Washington Crossing.

After the Malibu turned left from Liberty Street on to Route 8 North toward Oil City, Chief Wenner initiated a stop. Chief Wenner and numerous other Strike Force agents exited their vehicles with weapons drawn. Chief Wenner approached the Malibu on the driver side with a rifle pointed at the occupants and questioned them by asking, "Eddie?" Chief Wenner testified that [Montgomery], seated in the passenger seat, nodded in affirmance. Chief Wenner repeated, "Eddie Montgomery?" [Montgomery] nodded again. Chief Wenner handcuffed [Montgomery] and informed him he was under an investigative detention and was not free to go. Chief Wenner testified that he had seized the car. The driver of the vehicle was ultimately identified as Chardai Hobson and subsequently detained along with [Montgomery].

After completing the arrest, Strike Force agents moved [Montgomery], Chardai Hobson, and the Malibu to a nearby parking lot to alleviate the safety and traffic concerns due to the stop occurring at a busy intersection. [Chief Wenner talked with Montgomery, who admitted to transporting marijuana and provided the cell phone connected to the 313 number. Police searched the car pursuant to a warrant and found marijuana, cocaine, and fentanyl.]

---

[2] Chief Wenner identified this informant as "CI one," the same person involved in the previous controlled buys. N.T., 3/6/25, at 32. Agent Martinec testified that this informant was reliable "because everything that was stated we were able to verify or do ourselves." N.T., 1/16/25, at 47.

Order and Opinion of Court, 6/26/25, at 1–8 (edited, record citations omitted).

The parties filed briefs as directed. The suppression court then granted Montgomery's motion to suppress, reasoning that the Commonwealth failed to show that the stop of the Malibu was legal.

The Commonwealth timely appealed, certifying that the suppression order terminated or substantially handicapped the prosecution of its case against Montgomery. As directed by the suppression court, the Commonwealth filed a concise statement of matters complained of on appeal. *See* Pa.R.A.P. 1925(b). The suppression court thereafter issued a statement in lieu of an opinion concluding that the issues in the Commonwealth's Rule 1925(b) statement were too vague for the court to address.

On appeal, the Commonwealth raises issues identical to those in its Rule 1925(b) statement:

> Whether or not the Court erred in concluding the stop of [Montgomery's] vehicle was unconstitutional, suppressing [Montgomery's] statements and the drugs found in the vehicle as fruit of the poisonous tree.
>
> a. The lower Court failed to consider many undisputed facts of record, which would show probable cause under a totality of the circumstances.
>
> b. The lower Court failed to address probable cause in its definition and failed to apply the standard correctly on the felony non-warrant stop of [Montgomery's] vehicle.

Commonwealth's Brief at 4.

As a threshold matter, we first address the suppression court's conclusion (which Montgomery supports) that the Commonwealth waived its

- 7 -

issues by failing to specify them in its Rule 1925(b) statement. A Rule 1925(b) "Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge. The judge shall not require the citation to authorities or the record; however, appellant may choose to include pertinent authorities and record citations in the Statement." Pa.R.A.P. 1925(b)(4)(ii). An appellant who is directed to do so must prepare a statement that "is both concise but also sufficiently detailed to identify all of the issues desired to be raised on appeal." *Commonwealth v. Price*, 284 A.3d 165, 170 (Pa. 2022). The latter requirement avoids leaving a trial court "to guess at the issues raised." *Commonwealth v. Hansley*, 24 A.3d 410, 415 (Pa. Super. 2011) (citing *Commonwealth v. Reeves*, 907 A.2d 1, 2 (Pa. Super. 2006)). If a concise statement is "too vague to allow the [trial] court to identify the issues raised on appeal," then a reviewing "court may find waiver." *Id.* However, an "arguably vague" Rule 1925(b) statement with "only one obvious appealable issue" that puts the trial court on sufficient notice to address it in its Rule 1925(a) opinion is adequate to preserve the included issue. *Reeves*, 907 A.2d at 3 (Gantman, J., concurring) (citations omitted).

Here, the Commonwealth's first sub-issue was too vague to apprise the suppression court of which "undisputed facts" from the two-day hearing the court did not consider. The court stated that it could not "adequately respond without knowing which specific facts" the Commonwealth meant. Trial Court Statement, 8/8/25, at 2. Montgomery posits that the only "undisputed facts"

- 8 -

would be stipulations. Montgomery's Brief at 11. A review of the record does not reveal that any particular fact was obviously dispositive in the Strike Force's choice to stop the vehicle. Not until the argument section of its brief does the Commonwealth articulate which four facts the suppression court failed to consider. Because the Commonwealth's first sub-issue required the suppression court to guess at which facts merited consideration, we deem it to be waived. *Hansley*, 24 A.3d at 415; *cf. Commonwealth v. Postie*, 110 A.3d 1034, 1041 (Pa. Super. 2015) (finding a concise statement overly vague for its failure to identify what remark during a two-day suppression hearing an appellant challenged).

As to the Commonwealth's second sub-issue, about probable cause for the "felony non-warrant stop" in this case, the suppression court again suggested waiver. The court stated that it could not "determine, based on the language, whether the [Commonwealth] is challenging the vehicle stop based on probable cause that a crime is on-going or about to be committed or a warrantless felony arrest based on probable cause [Montgomery] committed a prior felony." Suppression Court Statement, 8/8/25, at 2. However, the Commonwealth consistently advanced only one theory of why the stop was legal: the Strike Force had probable cause to believe that Montgomery was transporting drugs from Detroit to Oil City. N.T., 3/6/24, at 120–25; Brief in

Opposition, 4/25/25, at 9–11.[3] Importantly, the suppression court considered the Commonwealth's argument.[4] Because there is one obvious probable cause issue, which the suppression court already addressed, this Court, too, will analyze its merits.

This Court applies a "well established" standard of review over an order granting suppression:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts. Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

*Commonwealth v. Miller*, 307 A.3d 784, 787 (Pa. Super. 2023) (quoting *Commonwealth v. Korn*, 139 A.3d 249, 252–53 (Pa. Super. 2016)) (internal citations and quotation marks omitted).

Before police may arrest an individual in public without a warrant, the Constitutions of the United States and of Pennsylvania require "probable cause

---

[3] By contrast, the Commonwealth's appellate brief vacillates between arguing reasonable suspicion and probable cause. We limit our analysis to probable cause because the Commonwealth never argued to the suppression court that the Strike Force had reasonable suspicion.

[4] The suppression court also rejected a Vehicle Code violation as a basis for the stop. The Commonwealth never argued there was a Title 75 offense.

to believe that the particular individual to be arrested committed a felony."

***Commonwealth v. El***, 933 A.2d 657, 661 (Pa. Super. 2007) (citing

***Commonwealth v. Clark***, 735 A.2d 1248, 1251 (Pa. 1999)). Probable cause

is a fact-dependent inquiry based on the totality of the circumstances:

> Probable cause is [established] when "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." The question we ask is not whether the officer's belief was "correct or more likely true than false." Rather, we require *only a* "*probability*, and not a prima facie showing, of criminal activity." In determining whether probable cause exists, we apply a totality of the circumstances test.

***Commonwealth v. Williams***, 2 A.3d 611, 616 (Pa. Super. 2010) (quoting

***Commonwealth v. Thompson***, 985 A.2d 928, 931 (Pa. 2009)) (internal

citations omitted).

Here, the suppression court determined that the Strike Force agents

reasonably believed prior to the stop "that (1) the phone for the 313 number

was used in coordinating the sale of drugs out of the Plum Apartments, (2)

the trap and trace ping information located the phone in Detroit, Michigan, (3)

on June 4, 202[4], the ping information showed the 313 number moving away

from Detroit, Michigan toward Oil City, Pennsylvania, (4) a white Chevy Malibu

with Michigan plates exited interstate 80 at the Barkeyville exit and traveled

to Franklin, PA, and (5) two unidentified dark-skinned individuals were

occupants of the Malibu." Order and Opinion, 6/26/25, at 22. However, the

court determined that the record did not support the Strike Force stopping the

Malibu either to investigate drug trafficking or to arrest Montgomery for transporting drugs. *Id.* at 23–28.

Our analysis differs from the suppression court's in the weight given to the informant's tip, the ping data corresponding to the Malibu, and the association of Montgomery to the 313 number. First, the court rejected any reliance on the tip that Griffin "was out of drugs and there was a resupply coming," as Agent McGranahan only said that the source was "a confidential informant" but did not say which informant or provide a basis for the informant's reliability. *See* N.T., 1/16/25, at 105. However, Chief Wenner clarified that this was the same informant Agent Martinec had been handling. N.T., 3/6/24, at 32. The Strike Force had corroborated this informant in the controlled buy, thereby learning about calling the 313 number to arrange for a drug sale. As the Strike Force could rely on the prior information, they could also consider the informant's tip to believe that a resupply was occurring on June 4, 2024.

Second, the suppression court deemed the ping information to be too speculative to conclude that the phone with the 313 number was in the Malibu. The court reasoned that a 3,000-meter range would encompass a large part of the City of Franklin, where agents would otherwise have reason to suspect the phone to be in every car within a two-mile radius. The court distinguished *Commonwealth v. Milburn*, 191 A.3d 891, 898–99 (Pa. Super. 2018), in which we found police had reasonable suspicion to stop a van at the location of a "Find My iPhone ping" from a device stolen earlier in the same night.

Notably, the ping information "was but one factor" supporting an investigatory stop, as the police officer had experience using the app, arrived quickly, saw no other vehicles at the location, observed the van's driver acting nervously, and knew the location to be a high-crime area. ***Id.*** at 899.

Like in ***Milburn***, the ping data here was but one factor indicating that the phone with the 313 number would be in the Malibu, which exited the highway at the time the ping was "directly on top" of its location. N.T., 1/16/25, at 108. The ping continued to match the location of the Malibu as the Strike Force followed. ***Id.*** at 47 ("Okay, it's there, that white vehicle's there. The next ping comes in, it's there, that white vehicle's there."). While the location of the stop was not significant as a "high-crime area," it was meaningful for another reason the suppression court noted: Washington Crossing is the last major turn on the route from Detroit to Oil City. Order and Opinion, 6/26/25, at 6–7. Because the Malibu continued along this route, and pings continued to correspond to its general location, the probability increased that the phone was in the Malibu, headed to Oil City.

Finally, the suppression court ruled that there was no probable cause that Montgomery was the perpetrator. Agent Martinec testified from his training and experience that drug dealers try to hide their identity with multiple aliases and phones, and the CLEAR search for the 313 number produced multiple names (Eddie Montgomery, as well as Ethan Montgomery). The agents obtained a picture of Eddie Montgomery but did not document any attempt to verify him as the owner of the 313 number. Prior to the stop (when

Chief Wenner asked "Eddie?"), the suppression court thus concluded that the Strike Force could not know that Montgomery was in the car.

Although this information alone would not establish that Montgomery was in the car, it was sufficient when combined with the other circumstances. Agent Martinec explained that although the CLEAR search yielded multiple names associated with the 313 number, he clicked through to find "everything kept coming back to Eddie Montgomery." N.T., 1/16/25, at 63. From the controlled buys, the Strike Force believed that the 313 number had been in Detroit. The pen register, in place for less than a week before the stop, showed that the 313 number, while in Detroit, was still being used to coordinate drug deals in Oil City. Although the agents knew that drug dealers frequently replace their "work" phones, the recent use showed that the 313 number was still in use. The ping information and tip from June 4, 2024, provided an adequate basis to believe that the phone was in the Malibu. From these circumstances, we conclude the Strike Force reasonably believed that Montgomery had his phone while transporting drugs in the Malibu. Thus, the stop to effectuate a warrantless arrest here was proper.

We therefore reverse the order granting suppression. Notably, Montgomery also argued that evidence from Chief Wenner's speaking with him and from the warranted search of the vehicle should be suppressed. The suppression court granted suppression under these theories based on the conclusion that the initial stop was unconstitutional. We reverse the order granting suppression based on the vehicle stop and Montgomery's statements

as "fruit of the poisonous tree." On remand, the suppression court may rule in the first instance whether Montgomery's statements to Chief Wenner were given in violation of Montgomery's **Miranda** rights.

Order granting suppression reversed. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/27/2026